**HULEN v. CITY OF CORSICANA.**

No. 6789.

Circuit Court of Appeals, Fifth Circuit.

June 28, 1933.

Rehearing Denied July 21, 1933.

J. H. Barwise and William R. Watkins, both of Fort Worth, Tex., for appellant.

Richard Mays, of Corsicana, Tex., for appellee.

Before BRYAN, FOSTER, and HUTCHESON, Circuit Judges.

HUTCHESON, Circuit Judge.

This is an appeal from a hearing in which the city contended and the District Judge found that the receiver's expenditures for the protection of the railway company's embankment and track, made necessary by the construction of the city's reservoir, were not recoverable damages, because, when the railway company acquired its right of way and laid its track down over Elm creek, it did so subject to the obligation to conform the track and right of way to changes in the condition and uses of the stream. The facts are undisputed: In 1906 the railway company acquired in fee simple its right of way across Elm creek, a nonnavigable stream. At this point about three miles southeast of the corporate limits of the city of Corsicana the creek is about 12 feet wide, and normally 14 feet in depth, with a valley 1,600 feet wide from rim to rim. Across this creek and valley the railway company constructed

a bridge 257 feet long and an embankment 1.425 feet long, rising at points to a height of 27 feet. In 1914 a receivership of the railway company in the United States District Court for the Northern District of Texas was begun. In 1919 the city of Corsicana, a municipal corporation under a home rule charter, having authority to own and maintain a waterworks system to furnish fresh water for the use of the city, and for sale for profit to its inhabitants and to such others as might desire to purchase it, and to condemn lands for such purposes in and out of the city, decided to construct a reservoir by damming Elm creek. This dam was located down stream about a mile and a half from the right of way of the company, and was between 2,600 and 3,000 feet in length. It would hold, when completed, about two and a half billion gallons of water. When full, the waters of the reservoir would back up and across the right of way of the company to stand at a level of 17 feet in depth at the bridge, feathering out on the rims of the valley. To prevent the submerging of its right of way and injury to its embankment by the maintenance of the reservoir, the receiver filed an ancillary bill in the cause to enjoin the construction, alleging that it would destroy its embankment, bridges, and tracks.

After the filing of the bill, an agreement was reached in the cause that no injunction should issue, and that without prejudice to the ultimate determination of the legal rights of the parties no actual condemnation proceeding need be instituted, but the work of construction should go on, the railway company should make the necessary expenditures to protect its embankment and tracks, and the city should execute a bond to pay such damages as in the cause it should finally be adjudged to pay. Under this agreement the reservoir was completed, the expenditures made, and the matter submitted to the court below. The city has since operated its waterworks, drawing water therefrom to sell to its inhabitants, to oil companies for drilling and operating purposes, and to others. The operation of the plant has been profitable to the city. The result of the construction has been to submerge 5 acres of the right of way between the outer rims thereof and the embankment on which the rails are located and to cause the reasonable and necessary expenditure to protect the railway's track and embankment, by widening the embankment and riprapping both sides of it with stone from the valley rims to the bridge, of $20,625.25.

Had the receiver not made the expenditure, the action of the water in the reservoir would have destroyed the dump, making it impossible to operate the railroad over it. Prior to the construction of the reservoir, the bridge, dump, and right of way were maintained in such manner as that the natural flow of Elm creek was not in any wise impaired or hampered. The reconstruction work done by the receiver, and the expenditures involved, were made necessary solely on account of the fact that the city built the reservoir. For these expenditures and for the value of the right of way taken the receiver made claim. The District Judge awarded the receiver $250, $50 an acre for the 5-acre tract taken, and also awarded the city an easement along and across the right of way to maintain the reservoir, without accountability to the railway company for the expenditures it had been obliged to make.

Full conclusions of law and of fact were filed, but no opinion giving reasons for the conclusions of law. The arguments before us, however, make it clear that the District Judge grounded them on his view that, in regard to the expenditures made for strengthening the track, the property of the company was neither taken nor damaged. He thought that the duty which the company was under to adapt its right of way and track to the changing conditions required by the legitimate exercise of police power in the interests of the public extended to requiring it to adapt its track at its own cost, to the construction and maintenance of the city's reservoir. If it did, the judgment was right. If it did not, it was wrong.

Neither the Fifth nor the Fourteenth Amendments to the Federal Constitution, nor article 1, § 17, of the Texas Constitution, operate to limit the reasonable and just exercise of the police power of the state. Vague, shadowy, and shifting though the limits of this power sometimes appear to be, it is settled that in the exercise of the police power a state may take, damage, or destroy private property without compensation, when the public necessity, the public health, or the public safety require it to be done. Because, however, these limits are shadowy, vague, and apparently shifting, it is in the last analysis for the courts to say whether questioned action has properly called into being the exercise of the power, and whether the power is being exercised reasonably and within the limits of public necessity.[1] Spann v. City

[1] "The protection of private property in the Fifth Amendment presupposes that it is wanted for pub-

of Dallas, 111 Tex. 357, 235 S. W. 513, 19 A. L. R. 1387; Stockwell v. State, 110 Tex. 554, 221 S. W. 932, 12 A. L. R. 1116; People's Petroleum Producers v. Sterling (D. C.) 60 F.(2d) 1041; People's Petroleum Producers v. Smith (D. C.) 1 F. Supp. 361; Houston & T. C. R. Co. v. City of Dallas, 98 Tex. 396, 84 S. W. 648, 70 L. R. A. 850; M. K. & T. R. R. v. Rockwall County, 117 Tex. 34, 297 S. W. 206, 208; Constantin v. Smith (D. C.) 57 F.(2d) 227; Pennsylvania Coal Co. v. Mahon, 260 U. S. 393, 43 S. Ct. 158, 67 L. Ed. 322, 28 A. L. R. 1321.

■ Appellant urges that to say in the face of a Constitution like ours, providing "No person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made" (article 1, § 17), a municipal corporation can saddle on to a railroad company a part of the necessary cost of establishing a waterworks system, to be operated for the private profit of itself and its inhabitants, is to run into the ground both the doctrine of public interest and police power, in order "in the interest of the City's necessities" to shift its burden onto the shoulders of the railroad company. He argues that the matter stands here no differently than it would stand if a waterworks company, established by private capital, having powers of eminent domain and a franchise to construct and lay down its system, had built the reservoir and flooded the receiver's lands. He insists that the Texas authorities settle beyond question that a railroad company, like any other property holder, is entitled to full compensation for all damages sustained by it through the exercise of the city's power of eminent domain.

"It can make no difference we think, within the meaning of this rule, whether the property taken, damaged, or destroyed be the property of an individual or of a railway corporation. There is nothing in the Constitution or statutes indicating such a distinction, nor does anything occur to us upon which such a distinction could be soundly based." Missouri, K. & T. R. Co. v. Rockwall County, 117 Tex. 34, 297 S. W. 206, 210.

That it is only in cases where, through the proper exercise of the police power, it is compelled to adapt its tracks to the exigencies of the public need, that such adaptation is not a taking or damaging of its property. Missouri, K. & T. R. R. v. Rockwall County, supra.

Appellant concedes that, if the action of the city in this case can be regarded as public action taken for the benefit of the public health, welfare, or safety under the police power of the state, the railroad may not recover. He insists that under the uniform current of authorities in Texas it may not be so regarded. He points to the fact, settled beyond question, that furnishing water and light to its inhabitants and others is not a public activity. It is, like maintaining and draining streets, and furnishing light and sewerage, a proprietary activity. In the conduct of such activity a city is liable for the damage it causes. He cites as conclusive on the point City of Amarillo v. Ware, 120 Tex. 456, 40 S.W.(2d) 57; City of Wichita Falls v. Mauldin (Tex. Com. App.) 39 S.W.

---

lic use, but provides that it shall not be taken for such use without compensation. A similar assumption is made in the decisions upon the Fourteenth Amendment. * * * When this seemingly absolute protection is found to be qualified by the police power, the natural tendency of human nature is to extend the qualification more and more until at last private property disappears. But that cannot be accomplished in this way under the Constitution of the United States. * * * We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change. As we already have said this is a question of degree—and therefore cannot be disposed of by general propositions." Holmes, J., in Pennsylvania Coal Co. v. Mahon, 260 U. S. 393, 43 S. Ct. 158, 160, 67 L. Ed. 322, 28 A. L. R. 1321.

"When Legislatures are held to be authorized to do anything considerably affecting public welfare it is covered by apologetic phrases like the police power, or the statement that the business concerned has been dedicated to a public use. The former expression is convenient, to be sure, to conciliate the mind to something that needs explanation; the fact that the constitutional requirement of compensation when property is taken cannot be pressed to its grammatical extreme; that property rights may be taken for public purposes without pay if you do not take too much; that some play must be allowed to the joints if the machine is to work." Tyson v. Banton, 273 U. S. 445, 47 S. Ct. 426, 433, 71 L. Ed. 718, 58 A. L. R. 1236. Holmes, J., dissenting.

"The police power is subordinate to the Constitution, as is every other power of the government. * * * If this were not true, * * * the result would be to subject the citizen's property solely to executive authority, putting it beyond the protection of the courts, and depriving the courts of their essential power of determining what, under the written law, is lawful and what is not—declaring the law of the land—and adjudging property rights accordingly." Stockwell v. State, 110 Tex. 554, 221 S. W. 932, 934, 12 A. L. R. 1116.

"The police power is founded in public necessity, and only public necessity can justify its exercise. The result of its operation is naturally, in most instances, the abridgment of private rights. Private rights are never to be sacrificed to a greater extent than necessary. Therefore, the return for their sacrifice through the exercise of the police power should be the attainment of some public object of sufficient necessity and importance to justly warrant the exertion of the power. The public health, the public safety, and the public comfort are properly objects of this high importance; and private rights, under reasonable laws, must yield to their security." Spann v. City of Dallas, 111 Tex. 357, 235 S. W. 513, 515, 19 A. L. R. 1387.

(2d) 859; City of Amarillo v. Tutor (Tex. Com. App.) 267 S. W. 697; Hidalgo County Water Imp. Dist. v. Holderbaum (Tex. Com. App.) 11 S.W.(2d) 506; City of Waco v. Roberts (Tex. Sup.) 48 S.W.(2d) 577; City of Brady v. Cox (Tex. Civ. App.) 48 S.W. (2d) 511; Hanks v. Port Arthur (Tex. Sup.) 48 S.W.(2d) 944, 83 A. L. R. 278; Brewster v. Forney (Tex. Com. App.) 223 S. W. 175; White v. City of San Antonio, 94 Tex. 313, 60 S. W. 426; Fort Worth Imp. Dist. v. Fort Worth, 106 Tex. 148, 158 S. W. 164, 48 L. R. A. (N. S.) 994.

We agree with appellant. No reason suggests itself to us why a railroad company should be compelled to contribute to the cost of constructing municipal waterworks which the city built and is profitably conducting as a proprietary enterprise. The facts as found establish that the expenses imposed upon the railroad company were incurred entirely in the interests of the city and its inhabitants. If the property which the city flooded had been owned by a private citizen or corporation, no one would question that it could not be made to contribute to the city by assuming the burden here imposed. We think it goes without saying that neither may the railroad company be made to contribute to the project.

The judgment is reversed, and the cause remanded for further proceedings not inconsistent with this opinion.