**LONE STAR GAS CO. v. CITY OF FORT WORTH et al.**

No. 8257.

Circuit Court of Appeals, Fifth Circuit.

Dec. 9, 1937.

Rehearing Denied Jan. 15, 1938.

Ogden K. Shannon, of Fort Worth, Tex., and Roy C. Coffee and Marshall Newcomb, both of Dallas, Tex., for appellant.

R. E. Rouer and Geo. C. Kemble, both of Fort Worth, Tex., for appellees.

Before SIBLEY and HOLMES, Circuit Judges, and STRUM, District Judge.

SIBLEY, Circuit Judge.

Lone Star Gas Company sought to enjoin as contrary to the Fourteenth Amendment of the Constitution an ordinance of the City of Fort Worth which fixed standards for fuel gas sold within the city and prohibited dilution of it. The cause was referred to a master, whose report was in the main upheld by the District Judge, who denied relief and dismissed the bill.

The facts are not in serious controversy, though the conclusions to be drawn are. The master's report is not unassailable as is argued. The reference does not appear to have been by consent of both parties to an agreed master, but if it had been it would under the new Equity Rule 61½, 28 U.S.C.A. following section 723, be only advisory. The District Judge appears to have felt himself overmuch bound by it. Since there is really no question of the truthfulness of witnesses, but only of the weight of their expert opinions, we are quite free to consider the evidence de novo.

It appears that the gas company owns extensive pipe lines in Texas and Oklahoma and supplies fuel gas to numerous towns and cities, including Fort Worth and Dallas, Tex. In Fort Worth alone does it retail gas. There it has a long-established business. Prior to 1923 it supplied the city with gas from Oklahoma and Texas fields to the east and north. In that year it sought further supplies in West Texas, both from dry oil wells and casinghead gas saved from active oil wells. This gas is of much higher heat content than the others, but is variable and gave some trouble in the effort to use it, so that in 1924 at a cost of about $500,000 what is known as the Joshua Plant was established at which nitrogen gotten from the air was mixed with the gas so as to reduce and render more constant the heat content. The process was a new one and not used elsewhere. The gas from West Texas was thus "stabilized" at a little over 1,000 British Thermal Units per cubic foot, and then carried on to Dallas and Fort Worth, and some smaller towns. At Fort Worth gases from the north and east continued to be used, the mixture of them having about the same richness, but was introduced at a gate to the north while the gas from Joshua was used at that gate and also at two others to the east of the city. Ten years later in 1934, it having appeared that the nitrogen introduced at Joshua had been increased from an average of 9 per cent. to an average of 19 per cent., so that hundreds of millions of cubic feet of nitrogen per year were being fed through the meters and paid for as gas, a great discontent arose at Fort Worth. The gas company explains that the richness of the gas to be treated had increased, and that the quality of the mixture had only been held constant. There was also some complaint, not made very specific, that illnesses and a few deaths had been caused in Fort Worth by gas. Dallas and Fort Worth joined in having men from the United States Bureau of Standards make elaborate experiments with the various gases furnished and their respective behavior in heating apparatus and their efficiency. An elaborate report was made. Dallas took no action, but Fort Worth passed an ordinance in 1934, modified and superseded in 1935 by that before us. The ordinance makes no legislative findings and recitals, but in section 1 requires that only natural fuel gas be furnished and distributed in the city, of the quality and character produced by nature in the oil and gas fields; that helium, sulphur, gasolene, oil, vapors, propane, and butane may be extracted; but no air or the elements of

air from which the oxygen had been extracted shall be added, except what is unavoidable in producing the gas at the wells. Section 2 requires that the gas shall contain not less than 1,000 British Thermal Units per cubic foot at a stated pressure and temperature. Section 3 deals with delivery at higher pressures by agreement; but section 4 requires that ordinarily it be delivered at the meters at a pressure of not less than four nor more than eight ounces above atmospheric pressure. Section 5 declares that if any part of the ordinance be found invalid or inoperative or void, the balance shall stand. Section 6 repeals conflicting ordinances, and section 7 fixes penalties for violations.

The gas company attacks the ordinance, and particularly sections 1 and 4, as arbitrary, depriving it of its established business and the value of its investments at Joshua and Fort Worth without due process of law, interfering with a lawful and harmless and indeed necessary and useful treatment of its merchandise without any good reason. The city asserts its charter power to fix the quality of the gas and the service in connection with it, and insists that the prohibition of dilution in section 1 is needful for the health and safety of the citizens. The master found that the diluted gas had some tendency to "lift" from the burners and possibly form carbon monoxide, but that this was insignificant, and not enough to prevent it being a gas which gives safe and satisfactory service in cities where it is the only gas supplied. He found a more serious trouble in the effort to use the gas from Joshua interchangeably with the other gases in the same burners at Fort Worth, since there was a difference in specific gravity, which he thought would require a change in the adjustment of the burners. He thought the undiluted West Texas gas would interchange better, but he found that the best interchange would be secured if the West Texas gas was diluted with only 4 or 5 per cent. of nitrogen instead of 19 per cent. In this he followed the opinion of the Bureau of Standards men. He sustained the ordinance finally in its total prohibition of dilution on the ground that daily variations in the West Texas gas made scientific accuracy in dilution impracticable, and that the difficulty of supervision made it reasonable to forbid dilution entirely. The District Judge did not uphold the master as to the impracticability of accurate dilution, but upheld his last conclusion that more satisfactory and safer service would result from compliance with the ordinance.

The City of Fort Worth, under article 1175, Vernon's Ann.Civ.St.Tex., has power: "To determine, fix and regulate the charges, fares or rates of any person, firm or corporation enjoying or that may enjoy the franchise or exercising any other public privilege in said city and to prescribe the kind of service to be furnished." Its charter enables it in respect of public utility franchises "To establish reasonable standards of service and quality of products and prevent unjust discrimination in service or rates," and "To impose other reasonable regulations conducive to the safety, welfare and accommodation of the public." The attacked ordinance, if reasonable, is within the power granted. If, however, it takes property, including established business, without due process of law, that is, arbitrarily, it is unconstitutional legislation, in addition to being unreasonable under the charter.

The sections which fix the quality of the gas in thermal units, and the pressure at which it shall be delivered for use, are plainly both reasonable and constitutional regulations. They require no more than the gas company has been endeavoring to do in the past. It complains of the pressure requirement at the meters because many of the meters are on service lines owned by the patrons, whose size or length may reduce the pressure though sufficient when the gas leaves the pipes of the gas company. The possibility of cases arising in which pressure failure should not reasonably be punished as the gas company's fault does not condemn the ordinance, but may be dealt with when that emergency arises. The ordinance itself provides that the ascertainment that any section or part thereof is either invalid or inoperative shall not affect the remainder.

Section 1 we think is unreasonable, and to a degree that renders it also arbitrary and in violation of the Fourteenth Amendment. Despite the generality of its terms it applies only to the Lone Star Gas Company, which alone has a franchise to supply gas in Fort Worth. It is not put forward as an original regulation of the service, but as a prohibition of the continuance of a practice which had endured without protest for ten years, and had involved a large investment. The addition of air or nitrogen to the gas is not forbidden because

either is directly harmful to health; they are breathed continually. Nitrogen is present in different quantities in all natural gas. That from Petrolia, which from the beginning has been a factor in the Fort Worth supply, has as much as 40 per cent. nitrogen, but is not complained of and can be used under the ordinance. Five or six per cent. nitrogen on the average is naturally present in the West Texas gas. So far as health and service are concerned, the master is right in his conclusion that the objection to the Joshua gas must rest on its being overdiluted for interchange with the gases from other sources used at Fort Worth. The evidence abundantly establishes that gases with a wide range of thermal units can be satisfactorily used by adjusting the burners for each. But the adjustment being made for a rich gas, if a poorer one is supplied, ignition is difficult and the flame may go out, allowing unburned gas to escape and producing a liability to explosions. If the adjustment is for a poor gas and a rich one is supplied, the flame will be yellow, may smoke, or the combustion may be incomplete so that poisonous carbon monoxide is produced instead of the usual carbon dioxide. The older gas supplies from the north and east are insufficient for the City of Fort Worth, and the gas from Joshua has to be used in varying quantities to supplement or replace the other gases. At one time the use of the Joshua gas has risen to 100 per cent. The burners within the city must burn now one gas and then another. The gas company has gone on the theory that it was only necessary to keep the gases at about the same richness in thermal units, and this it has done. It may be noted that this content of thermal units is the only element dealt with in the standard fixed by the ordinance. But the witnesses for the city say the specific gravity of the gases is also important, and that of the Joshua gas is increased by the addition of too much nitrogen. They say that the best interchange would be attained, not by adding no nitrogen, but by adding 4 or 5 per cent. And it is testified that the addition of air would be better than nitrogen. The gas company, however, contends that air pockets might make a burning or even explosive mixture in the mains and the inert nitrogen is safer. But the ordinance prohibits either air or nitrogen. Since all the evidence is that some dilution of the West Texas gas, which must be used in part at Fort Worth, is desirable, some collateral reason other than safe and satisfactory service must be sought for prohibiting it altogether. One reason that suggests itself is the fraud of adulteration; the selling of vast amounts of almost costless nitrogen as gas. This very likely has led to the feeling manifested in the record. But it cannot be regarded as a fraud, because openly done, and partly for the purpose of making the West Texas gas interchangeable with the other gas at Fort Worth. The only value in fuel gas lies in its thermal units, and when the stipulated units are furnished it ought to make no real difference whether the remainder of the gas is dilution natural or artificial. If dilution is carried too far, the reasonable remedy is regulation, not prohibition. And it must be remembered that if there is profit to the gas company in introducing the nitrogen, the patrons have the benefit of it in the rates fixed. The evidence is that the Railroad Commission has taken cognizance of the Joshua Plant in fixing gas rates elsewhere, and that Fort Worth is now engaged in revising its gas rates.

The master sought to justify the prohibition on the idea that supervision of regulation might be difficult. His idea was adopted by the city in an amendment of its answer; but as an afterthought, and it is supported by no evidence. The evidence is that calorimeters, showing the content of the gas, continuously operate on it as it reaches Joshua, to ascertain what amount of nitrogen should be added; and again as it leaves Joshua to see that the content is as intended. Calorimeters are also installed by the gas company for each source of supply at Fort Worth. They are all observable by the city officials. The city itself maintains a calorimeter in the city hall, continuously checking the gas there, and the city chemist checks it also with chemical tests from time to time. Supervision is not only easy, but is actually carried on, and must be to enforce the regulation in section 2. No representative of the city pretends that there would be any great difficulty in supervising the nitrogen content of the gas, if it should be limited.

It may be that pipe lines, mains, and meters could be built and rearranged so as to furnish West Texas gas undiluted to part of the city and other gas to the rest, without interchange. This would not only entail great expense to the gas company, but would probably result in different rates for the differing gases, and in embarrassment if one supply or the other ran low.

Though parties, no member of the city government testifies to explain the real purpose of the prohibition or the reasonableness of it. The presumption is of course in favor of legislative action of all grades, and the burden is on one who attacks an ordinance which is within the general power of a city to show its unreasonableness. We are of opinion that the evidence here sustains the burden, and shows an interference with an established business and plant by prohibition when regulation would answer, so unreasonable as to be contrary to the charter power, and a taking of property without due process of law. That the police power must be exercised reasonably and within the limits of public necessity when individuals will be injuriously affected is well established. Weaver v. Palmer Bros. Co., 270 U.S. 402, 46 S.Ct. 320, 70 L.Ed. 654; Adams v. Tanner, 244 U.S. 590; People's Petroleum Producers v. Sterling, D.C., 60 F.2d 1041; Hulen v. City of Corsicana, 5 Cir., 65 F.2d 969; People v. Weiner, 271 Ill. 74, 110 N.E. 870, L.R.A.1916C, 775, Ann.Cas.1917C, 1065. The enforcement of section 1 ought to be enjoined, without prejudice to the enactment of such reasonable regulations touching the addition of air or nitrogen as the city may find necessary. The remainder of the ordinance stands.

The judgment is reversed, with direction to enter a decree accordingly.