**BENTON et al. v. COMMISSIONER OF INTERNAL REVENUE.**

No. 13641.

United States Court of Appeals Fifth Circuit.

June 20, 1952.

746

Arthur Glover, Amarillo, Tex., for petitioners.

Robert M. Weston, Ellis N. Slack, Helen Goodner, Carlton Fox, Sp. Assts. to Atty. Gen., Theron Lamar Caudle, Asst. Atty. Gen., Charles Oliphant, Chief Counsel, Bureau of Int. Rev., W. Herman Schwatka, Sp. Atty., Washington, D. C., for respondent.

Before HUTCHESON, Chief Judge, and BORAH and RIVES, Circuit Judges.

RIVES, Circuit Judge.

The petitions for review involve deficiencies for the calendar year 1945 in income taxes of H. T. Benton (sometimes hereafter referred to as taxpayer) in the sum of $12,646.19, and Elizabeth Benton, taxpayer's wife, in the sum of $12,536.19. A single question is presented for decision, viz:

Whether the sum of $45,000 consisting of the payment of $5,000 per month for each of the last nine months of the taxable year 1945, made by the taxpayer under a so-called rental agreement, is deductible in that year as a business rental expense, as he contends, or represents a capital investment, as the Commissioner contends and the Tax Court found.

The opinion of the Tax Court is not officially reported, and while its findings of fact are lengthy, we see no way adequately to present this case except to quote substantially the full text of those findings

"Petitioners H. T. Benton and Elizabeth Benton are husband and wife, residing at Amarillo, Texas. The income and deductions here in issue were those of the marital community and were so reported by petitioners in their tax returns for 1945 filed with the collector of internal revenue for the second district of Texas. The husband, H. T. Benton, is hereinafter referred to as petitioner. He was born in 1911, quit school after the seventh grade, and from 1928 to 1936 was employed as a cab driver in Amarillo.

"In 1936 he operated a cab of his own. In 1937 he had a small cab operation in Childress, Texas, but in 1939 sold out and returned to Amarillo. He continued in the taxicab business in Amarillo, first with the City Cab Company and then with Safeway Cab Company, operating on a 'kick-back' basis around $1.50 a day. During this time he bought two new automobiles, financing them through Plains City Finance Company (hereinafter called Finance Company) a partnership composed of W. A. Mays and three associates (hereinafter called Mays, et al.). In October, 1943, he left the Safeway Cab and was in the used car business for two months. In 1943 he netted $923.78 from his cab operations and $500 from used car business.

"In January, 1944, he bought four cars in Kansas City, financing them through the Finance Company. Later in the month he purchased the Rainbow Taxicab for $3,000, paying $500 cash and borrowing the balance from the Finance Company, thereby acquiring three more cabs and seven permits. During 1944 he netted $12,049.99 from his operation of the Rainbow Taxicab. He owed the Finance Company $5,500 in January, 1944, but had paid same by the end of the year. For the first three months of 1945 he netted $3,854.85 from his Rainbow Taxicab business. His then net worth was $7,931, plus an equity in a duplex he bought in 1943.

"On March 28, 1945, he entered into a written agreement with Mays, et al., the owners of the Yellow Cab & Baggage Company of Amarillo (hereinafter called Yellow Cab), under which agreement the petitioner paid them in 1945 the $45,000 here in controversy.

"The agreement in substance was as follows:

"The preamble designates it a 'Lease Contract' and Mays et al. are termed the 'lessors' and petitioner, 'lessee'. It then proceeds:

"Whereas, Lessors are the owners of the following described motor vehicles, viz:

"(Here follows an itemized list of 13 motor vehicles, the motor number of each being given, and included therein were 2 Chevrolet school busses, 2 Chevrolet sedans, 1 Buick Fordor, 2 Dodge sedans, 1 Plymouth sedan, 1 Chevrolet truck, 2 Ford buses, 1 International bus, 1 Dodge Fordor sedan.)

"together with contracts under which fifteen (15) additional motor vehicles are operated in taxi service under ODT and City permits belonging to lessors, together with ODT and City permits and franchises authorizing lessors to operate the motor vehicles above described belonging to lessors, together with certain transportation contracts between the three railways and two airlines serving the City of Amarillo, Texas, together with a month to month only rental agreement covering that certain building now occupied by lessors located at the northeast corner of the intersection of Third and Taylor Streets in the City of Amarillo, Texas, together with one or more taxicab stands and locations in the City of Amarillo, Texas, together with telephone numbers 5242, 5243, 5244, together with the exclusive right to use the trade name of 'Yellow Cab & Baggage Company' in the City of Amarillo, Texas; and,

"Whereas, lessee is the owner of the following described motor vehicles, viz:

"(Here follows an itemized list of 9 motor vehicles, the motor number of each being given, and included therein were 5 Chevrolet Fordor sedans, 1 DeSoto sedan, 1 Chevrolet sedan and 2 Ford Fordor sedans.) together with ODT and City permits and franchises to operate the same, which motor vehicles lessee has heretofore operated under the name and style of 'Rainbow Taxi'; and,

"Whereas, said lessee desires to lease all of the above described equipment from lessors for a period of ten (10) months and to procure an option to purchase such equipment at the end of ten months, and in order so to do is agreeable to giving said lessors security for the compliance by lessee of the terms and conditions of the Lease Contract hereinafter contained, therefore, it is agreed and contracted by and between the parties hereto as follows:

I.

"For the purpose of guaranteeing lessors in the full and faithful performance by lessee of all of the terms and provisions of this Contract * * * (Here follows lessee's transfer and assignment to lessors of above motor vehicles).

"In consideration of the premises, lessors have this day and do by these presents lease and let unto lessee for a period of ten months commencing with the date 1st day of April, 1945 ending at midnight on the 28 day of February, 1946, each and every item of the above described personal property including the motor vehicles and other equipment belonging to lessors and first described herein as well as the motor vehicles and equipment this day conveyed unto lessors by lessee, which motor vehicles and the permits, franchises and contracts in connection therewith will be used by lessee solely for the purpose of carrying on and conducting a taxicab and light transfer business under the name and style of 'Yellow Cab & Baggage Company'.

"The consideration which the lessee shall pay the lessors for the use of the

above described equipment and privileges is as follows:

"(1) The sum of $50,000.00 shall be due and payable to lessors at Amarillo, Texas, as follows:

"The sum of $5,000.00 on the 1st day of May, 1945, and a like sum of $5,000.00 on the 1st day of each consecutive calendar month hereafter during the term of this Lease Contract.

"(2) Said lessee shall at all times keep and maintain in taxicab and transfer service not less than twenty-six (26) motor vehicles (either by ownership of such vehicles himself or under lease arrangement with the owners thereof similar to the lease arrangements under which lessors are now operating the fifteen (15) motor vehicles hereinbefore mentioned) and shall keep and maintain such motor vehicles covered with public liability and property damage insurance * * * and lessee shall keep the ODT and City permits authorizing the operation of all such twenty-six motor vehicles in good standing.

"(3) (Here lessee is required to keep the equipment in good working order, keep the licenses and permits in good standing and pay all taxes of every kind, including ad valorem taxes.)

"(4) (Here lessee is to pay all rents, utilities, telephone bills, etc.)

"(5) Lessee shall at his sole cost and expense replace any item of the above described items of equipment which may be destroyed or taken out of service for any reason.

"(6) (Here lessee is to conduct the business in an efficient manner and hold lessors harmless for damages from its operation.)

"(7) Any equipment purchased by lessee to replace any of the above described items of equipment shall be acquired in the name of and as the property of Yellow Cab & Baggage Company and shall be and become the sole and absolute property of lessors, it being the intention of all parties hereto that lessee is and shall be obligated to keep a like amount of vehicles belonging to lessors in such taxicab service at his own cost and expense.

"(8) Lessee shall discontinue the operation of Rainbow Cabs and use the name 'Rainbow Cabs' during the tenure of this Lease Contract.

"Lessee shall be and is hereby given the exclusive right and option to purchase all of the above described equipment belonging to lessors together with lessors ODT and City permits, lessors' rights to use and occupy the building and stands now occupied by lessors above described together with the exclusive right to use the name 'Yellow Cab & Baggage Company' in the City of Amarillo, Texas, together with the above described telephone numbers at any time within a period of five days after the expiration of the term of this Lease Contract upon the following terms and conditions, viz:

"Lessee shall pay unto lessors the total sum of $35.000.00 at Amarillo, Texas, in the following manner:

"The sum of $5,000.00 on or before thirty (30) days from the date that lessee exercises his option to purchase such property, and the sum of $5,000.00 shall be due and payable to lessors on or before the same day of each consecutive month thereafter until said total sum of $35,000.00 shall have been paid lessors; such deferred installments shall bear interest from maturity at the rate of 6% per annum and for the purpose of securing the payment of such deferred installments which shall be evidenced by the promissory note of lessee said lessee shall execute and deliver unto lessors his chattel mortgage lien covering each and every item of the above described equipment as well as any replacements or substitutions thereof as well as all ODT and City permits, franchises and licenses authorizing the operation of such motor vehicles as taxicabs, together with any lease agreements which lessee may have or receive from lessors covering the operation of motor vehicles belonging to third parties.

"(Here lessee is to operate the business 'without supervision or control in any respect on the part of lessors', but lessors are given the right to enter the premises where the equipment is kept for purpose of inspecting same.)

"(It is here provided that if lessee should fail to carry out any terms or provisions of this contract, then lessors are 'given the right without previous notice or demand to declare this contract terminated, null and void and to repossess themselves of each and every item of the above described equipment and property and permits, licenses, franchises and privileges, and to eject and evict lessee, his servants, agents and employees therefrom without in any manner being guilty of trespass, and any and all damages occasioned by the premises are hereby expressly waived by lessee, and upon such default on the part of lessee, lessee shall without further action upon the part of lessors forfeit unto lessors each and every item of the above described property which lessee has this day conveyed unto lessors as well as all of his right, title, estate or equity in or to the same together with all moneys therefore paid by lessee to lessors hereunder, such amount being agreed upon as liquidated damages, * * * and from and after such default shall not thereafter use or attempt to use the name "Yellow Cab & Baggage Company" or any of the above mentioned telephone numbers or locations, and the failure on the part of lessee to so cease' shall give lessors the right of injunctive relief.)

"Under this agreement petitioner at once took possession of and alone operated the Yellow Cab business until February 4, 1946, when he formed a partnership with W. A. Mays, he to own one-third and Mays two-thirds interest therein, and this partnership operated and owned the business until dissolved on February 1, 1948, and thereafter petitioner alone has owned and operated same.

"Prior to petitioner's acquisition of the business from Mays et al., it had been owned and operated from 1943 to April 1, 1944, by Blackwell & Hicks, who sold it on April 1, 1944, to Mays et al. for $60,000, payable $35,000 cash and the remaining $25,000 in five monthly payments of $5,000 each, all of which was paid when due. Properties acquired by Mays et al. from Blackwell & Hicks included 27 automobiles (some of which were not then being used as cabs), 18 city permits and 18 ODT permits,[1] shop and office equipment, trade name, good will, cab stands, telephone numbers and exclusive contracts with the three railroads and two airlines entering Amarillo.[2]

"The net profits from the operation of the Yellow Cab business under the different ownerships and managements were as follows: In 1943 Blackwell & Hicks, $44,000; in 1944 (4/1/44 to 3/1/45) Mays et al., $52,881; in 1945 (4/1/45 to 12/31/45), petitioner, $70,567;[3] in 1946, petitioner and Mays, $54,285; in 1947, petitioner, $45,416.

"Mays et al., prior to their purchase of Yellow Cab, had had no experience in the taxi business. Soon after April 1, 1944, they also bought a small cab company known as Safeway, and hired its owner, Hamilton, as night manager of Yellow Cab, but within two months re-sold Safeway to Hamilton, and he was no longer with them. On May 20, 1944, they sold Finance Company and W. A. Mays took over active management of Yellow Cab. He encountered difficulties in its operation, did not like the business, and early in 1945 Mays et al. decided to sell same, and Mays, acting for the firm, sought in a quiet way to find a purchaser, but without success.

1. Issued by Office of Defense Transportation during war years, without which cabs could not operate; only 1 permit could issue to each 1,000 population.

2. Through rail passengers were transported between depots in Amarillo, air passengers to and from the airport.

3. This sum includes $25,567, reported as net profit in petitioners' income tax return, plus the $45,000 in question.

"Recalling that petitioner had always met his payments to the Finance Company and was making a success of the Rainbow Cab, Mays approached petitioner, suggesting that he buy or lease Yellow Cab. Petitioner advised that he had no money with which to buy. Mays, realizing that petitioner 'hadn't been accustomed to dealing in large figures' at first discussed no terms, so the matter was talked between them several times, over a period of weeks, the negotiations finally resulting in the execution of the so-called rental agreement. Prior thereto Mays showed petitioner that the income from the railroad contracts was around $5,000 per month.

"At the time the agreement was executed: (a) it was the desire and hope of Mays et al. that petitioner would exercise the ·option to buy contained therein, and petitioner's hope that he would be able to do so; (b) both parties knew that it contained a forfeiture clause in the event of default, and further ·contained no provision for transfer of the Rainbow Taxicab properties back to the petitioner under any conditions.

"These points were discussed by the parties prior to execution, and as a result petitioner took out life insurance to protect his wife should he die before fulfillment of the contract.

"When the lease agreement was made, Mays et al. considered that in addition to their net profit from Yellow Cab through sales of equipment and depreciation reserves, they had recovered all of their investment therein except $28,210.30.[4]

"From April 1, 1945, to February 1, 1946, petitioner alone managed and operated the business, but ·did not claim to be its owner, and he was designated as its manager in the 1945 Amarillo city directory. ˚ However, he received all revenue from the business and paid all bills and expenses incurred therein, including repairs on cars. He pocketed the proceeds from all cars sold and personally paid for all new cars acquired, and any difference in cost on replacements. He paid all ·car license fees and agreed to or paid all ad valorem taxes. Feeling his incompetency to deal with the transportation companies when anything arose with reference to the railroad or air contracts, he called upon Mays to look after same, and in November, 1945, Mays, for Yellow Cab, negotiated a new contract with Braniff Airways. In 1945 Mays, at petitioner's request, managed the business for ten days while petitioner went to Detroit to the world series.

"The Yellow Cab was the largest taxicab concern in Amarillo and its trade name was valuable and was recorded in the Assumed Name Files of the county. Its telephone numbers ·were well known to the public and it owned more ODT and city permits than any other ·cab during the years in question. Its railroad and air line ·contracts netted about $5,000 monthly. The value of its intangible assets was much larger than the value of its motor vehicles and other physical properties, and the total value of Yellow Cab was largely in excess of $35,000 during all of 1945 and 1946.

"Petitioner placed all his Rainbow cabs and ODT and city permits in the name of Yellow Cab, as the agreement required. The short life of motor vehicles in the cab business required a constant replacement of cars and under the agreement petitioner was to replace same as needed at his cost and same were to belong to the Yellow Cab, and accordingly, between September 24, 1945, and December 12, 1945, he bought six motor vehicles.

"Toward the close of the ten month period, the war having ended, the volume of business was less and the profits were reduced some 20 to 25 per cent.

4. They base these figures on the depreciation schedules of the partnership income tax returns for 1944 and 1945.

Petitioner, feeling prosperous, had paid $6,000 for a home, and also had failed to make adequate provision for payment of his income taxes. He also needed new motor equipment, and for these reasons felt unable to pay the seven $5,000 monthly payments required under the purchase option, and so explained to W. A. Mays. Mays thereupon formed a partnership with petitioner, and within the five day limitation period they exercised the option under the agreement, paying in cash the $35,000 required which they borrowed from a bank, payable in monthly installments of $2,500, all of which they paid. Petitioner owned two-thirds and Mays one-third interest in the partnership, and petitioner was manager of the business, and the firm continued to own and operate Yellow Cab until about February 1, 1948, when Mays sold his one-third interest therein to petitioner for $25,000, payable $1,000 a month, and thereafter petitioner owned and operated the business alone.

"The tax consequences of the transaction in question were given no consideration by any of the parties thereto. W. A. Mays reported as ordinary income his portion of the $45,000 received from petitioner in 1945.

"For the year 1945 petitioners, in their income tax returns, claimed rental deductions of $45,000 paid Mays et al., but the Commissioner determined that such payments constituted a capital investment and disallowed same as rental deduction."

After thus setting forth its "findings of fact" at length, the Tax Court under the heading of "Opinion" properly points out that for the $45,000.00 to be deductible as a business rental expense, the taxpayer must prove that the payments came within the statutory requirement, 26 U.S.C.A. § 23(a) (1) (A), " * * * rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has

not taken or is not taking title or in which he has no equity."

Continuing, the Tax Court said:

"Title to the property in question petitioners had not acquired, but we can not say from the evidence that they were not acquiring title thereto, and the evidence does show that from the payments made and the contract and consideration upon which they were based petitioners did acquire and have an equity in the property, as defined and held in Judson Mills, 11 T.C. 25. Cf. Chicago Stoker Corp., 14 T.C. 441."

The cited decisions of the Tax Court developed an economic rather than a legal test for deciding whether a transaction amounts to a rental or a conditional sale, the test being stated in the Chicago Stoker Corp. case as follows:

"Cases like this, where payments at the time they are made have dual potentialities, i. e., they may turn out to be payments of purchase price or rent for the use of the property have always been difficult to catalogue for income tax purposes. A fixed rule for guidance of taxpayers and the commissioner is highly desirable, and it is also desirable that the rule, whatever it is, be as fair as possible, both to the taxpayer and the tax collector. If payments are large enough to exceed the depreciation and value of the property and thus give the payor an equity in the property, it is less a distortion of income to regard the payments as purchase price and allow depreciation on the property than to offset the entire payment against the income of one year * * *. The payee meanwhile is not reporting the payments since they are purchase price rather than rent and his gain or loss can be determined at the time of the final outcome of the transaction."

The opinion of the Tax Court in the present case further develops that economic theory: "Whether by the payment of $50,-000 in so-called rentals and the right to take title by paying $35,000 additional created an equity in the property depends upon its value. * * * If the value of the property here was less than the option

price, then petitioners acquired no equity in the property. The converse of this, however, is true, and if its value or market price exceeded, or materially exceeded the option price, then it would appear that petitioners did have an equity therein. * * * We find that petitioner did acquire and have an equity· in the property, which fact alone is determinative of the issue here."

■■ In undertaking to apply a purely objective economic test, the Tax Court has fallen into an error similar to that involved in Commissioner v. Culbertson, 337 U.S. 733, 69 S.Ct. 1210, 93 L.Ed. 1659. There being here involved no restraint by law or public policy, the parties had full liberty to contract as they pleased. Whether what is in form a lease is in effect a conditional sale contract depends on the intention of the parties.[5] The economic relation of the value of the property to the option price was only one factor to be considered in determining intent. Further that factor must be considered not as of the time for the exercise of the option, but rather in the light of the facts and circumstances as they existed at the time the parties entered into the contract. The property here involved was subject to drastic changes in value from many causes, such as rapid depreciation of taxicabs, the conclusion of the war, the lifting of government controls, etc. Within the limits of reason, the parties had a right to exercise their own judgment, and that of the Commissioner or of the Tax Court cannot be substituted therefor.

If the parties in good faith actually intended to enter into a lease contract, then the taxpayer, up until the time that he exercised his option to purchase, acquired no title to or equity in the property.[6] For the Commissioner and the Tax Court to decide solely by the application of an objective economic test that the taxpayer had an equity in the property, effectively begs the question to be decided, namely whether what was in form a lease was in substance and according to the real intention of the parties a conditional sale contract.

If the Tax Court's opinion afforded no further reasoning for its decision, we would have no hesitancy in deciding that it had not applied the correct rule of law. See Hormel v. Helvering, 312 U.S. 552, 553, 556, 61 S.Ct. 719, 85 L.Ed. 1037. However, immediately following its announcement last hereinbefore quoted,[7] the Tax Court continues:

"We also think that while some of the circumstances indicate a rental agreement, the evidence on the whole shows that intent of the parties to the so-called rental agreement and its primary purpose was the acquisition of Yellow Cab petitioner. We hold that petitioners have failed to sustain their burden of proof in showing a nonexistence of equity in the business, and also have failed to show that under the so-called rental agreement the petitioner was not taking and acquiring title to same, and hence we sustain respondent's determination that the $45,000 payments were not deductible as rent, but constituted a capital investment."

If we agreed with the respondent that the Tax Court finally got around to deciding that the so-called lease agreement was in effect a conditional sale contract, and that it assigned a correct reason for its decision, we would still think that in its use of the tests there was "at best, an error in emphasis." Commissioner v. Culbertson, 337 U.S. 733, 741, 69 S.Ct. 1210, 1214, 93 L.Ed. 1659.

---

5. Hervey v. R. I. Locomotive Works, 93 U.S. 664, 672, 23 L.Ed. 1003; Helvering v. Lazarus & Co., 308 U.S. 252, 255, 60 S.Ct. 209, 84 L.Ed. 226; Bankers Mortgage Co. v. Commissioner, 5 Cir., 141 F. 2d 357; Hogan v. Commissioner, 5 Cir., 141 F.2d 92, 93; West v. Commissioner, 5 Cir., 150 F.2d 723.

6. Helvering v. San Joaquin Fruit & Investment Co., 297 U.S. 496, 499, 56 S.Ct. 569, 80 L.Ed. 824; Purity Creamery Co. v. Hays, Tex.Civ.App., 4 S.W.2d 1056, 1057.

7. "We find that petitioner did acquire and have an equity in the property, which fact alone is determinative of the issue here."

The Tax Court's reference to its opinion of the intention of the parties as a reason merely supplemental to the economic "fact alone * * * determinative of the issue here", naturally weakens the weight which we might otherwise attach to its conclusion. The 1948 amendment to 26 U.S.C.A. § 1141(a) added the clause "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury". It repealed the contrary rule laid down in Dobson v. Commissioner, 320 U.S. 489, 64 S.Ct. 239, 88 L.Ed. 248, and made decisions of the Tax Court on questions of fact reviewable if clearly erroneous.[8]

Furthermore, accepting as true all of the findings of fact of the Tax Court, the error here complained of is in its inference or conclusion as to the intention of the parties. Primarily, to draw the proper inferences was the function of the Tax Court.[9] Inferences of fact made by the Tax Court will not be disturbed here unless clearly erroneous.[10] However, in drawing inferences and conclusions, the credibility of witnesses is usually not involved, and this Court may be in substantially as good a position as was the Tax Court.[11]

The Tax Court affirmatively found that: "The tax consequences of the transaction in question were given no consideration by any of the parties thereto." Under that finding the parties had no motive to conceal the real nature of the transaction.

The taxpayer was strictly a taxicab operator who had been successfully operating a small company. Mays and his associates were financiers anxious to get out of the taxicab business and having difficulty locating a purchaser. The $5,000.00 monthly payment was reasonable when considered strictly as a rental. After paying it, the taxpayer realized a net profit of $25,567.50 for the nine months period, April 1, 1945, through December 31, 1945, and for the entire lease term of ten months a net profit of $32,277.31.

In March, 1945, when the written agreement was signed, $35,000.00 was not an unreasonably low sale price under the terms of the option to be exercised ten months later. When that time arrived the war was over, the equipment was badly worn, and the earnings had declined. Ten months earlier the parties may have anticipated a greater decline in value. The taxpayer was unable to exercise his option and so informed Mays. Mays and his associates had the opportunity to take the property and sell it elsewhere. Instead, Mays, with the consent of his associates, formed a partnership with the taxpayer, and furnished the financial assistance to enable the partnership to make the purchase.

The conduct of the parties throughout was consistent with a lease. Mays kept in close touch with the business. In the City directory, the taxpayer was designated as manager of Yellow Cab, and the assumed name records of the county showed Mays et al. as the owners of Yellow Cab during the term of the lease. Mays reported as ordinary income the moneys received as rental from the taxpayer.

The respondent strongly contends that taxpayer "had not adequately explained

8. Burford-Toothaker Tractor Co. v. Commissioner, 5 Cir., 192 F.2d 633, 635; George Kemp Real Estate Co. v. Commissioner, 2 Cir., 182 F.2d 847, 848, 849; Tennessee, Alabama & Georgia Ry. Co. v. Commissioner, 6 Cir., 187 F.2d 826, 832; Commissioner v. Nubar, 4 Cir., 185 F.2d 584, 589; Omaha Nat. Bank v. Commissioner, 8 Cir., 183 F.2d 899, 902; Gillette's Estate v. Commissioner, 9 Cir., 182 F.2d 1010, 1014.

9. Helvering v. National Grocery Co., 304 U.S. 282, 295, 58 S.Ct. 932, 82 L.Ed. 1346; Burford-Toothaker Tractor Co. v. Commissioner, 5 Cir., 192 F.2d 633, 635.

10. See cases cited in Footnote 9 and Widney v. U. S., 10 Cir., 178 F.2d 880, 884.

11. Gillette's Estate v. Commissioner, 9 Cir.; 182 F.2d 1010, 1014; E. F. Drew & Co. v. Reinhard, 2 Cir., 170 F.2d 679, 684; Orvis v. Higgins, 2 Cir., 180 F.2d 537, 541; In re Kellett Aircraft Corp., 3 Cir., 186 F.2d 197, 200; Pacific Portland Cement Co. v. Food Machinery & Chemical Corp., 9 Cir., 178 F.2d 541, 548; Kuhn v. Princess Lida, 3 Cir., 119 F.2d 704, 705; Stewart v. Ganey, 5 Cir., 116 F.2d 1010, 1013; Lone Star Gas Co. v. City of Fort Worth, 5 Cir., 93 F.2d 584, 585.

the transfer of his own business to Mays et al. or reconciled it with his agreement to forfeit it in the event he did not avail himself of the option." We do not so construe the contract. The taxpayer's property was transferred to Mays et al. only as security for his compliance with the terms and conditions of the Lease Contract and was to be forfeited only in the event of his default, not upon his mere failure to exercise the option.

"A bill of sale absolute on its face will be deemed a mortgage if intended as such by the parties, that is, if it is given merely as security for a debt." 10 Am.Jur. 719, Chattel Mortgages, Sec. 7.

We conclude that the parties honestly intended the contract to ·be what it appeared, a lease containing an option to purchase, and that any finding to the contrary is clearly erroneous. The decision of the Tax Court is therefore

Reversed.