OPINION. TueneR, Judge: The respondent has disallowed deductions of payments made by petitioner to the R. F. C. under a “Lease and Option to Purchase” agreement, on the ground that the payments were not rental expenses within the meaning of section 23 (a) (1) (A) of the Internal Revenue Code of 1939,[1] which restricts deductions to rentals or other payments for the use or possession of property “to which the taxpayer has not taken or is not taking title or in which he has no equity.” Accordingly, the question for decision is whether petitioner was taking title to the property, or was acquiring an equity therein. An affirmative answer forecloses the deductibility of the payments. The payments in question, like those under consideration in Chicago Stoker Corporation, 14 T. C. 441, have dual potentialities, that is, they may turn out to be payments of purchase price or rent for the use of the property, and, as pointed out in that case, are difficult to catalogue for income tax purposes. It was there stated that if payments are large enough to exceed the depreciation and value of the property and “thus give the payor an equity in the property,” it is less of a distortion of income to regard the payments as purchase price and allow depreciation on the property, than to offset the entire payment against the income of 1 year. The Court cited Judson Mills, 11 T. C. 25, and Truman Bowen, 12 T. C. 446. The principle of these cases is that where the taxpayer, as a result of payments which have dual potentialities, acquires something of value under the payments, other than the mere use of the property, he is acquiring an equity and the payments do not, therefore, come within the definition of rent in section 23(a) (1) (A), supra. See Helser Machine Marine Works, Inc., 39 B. T. A. 644; Alexander W. Smith, Jr., Executor, 20 B. T. A. 27; and Holeproof Hosiery Co., 11 B. T. A. 547. And it does not matter whether the contract was in the form of a lease or a conditional sale, if under the terms of the contract by which payments were made the taxpayer was acquiring or building up an equity in the property in question. From the evidence of record, it is, in our opinion, clear that petitioner through the payments made under the agreement was in fact acquiring and building up an equity in the instant property and that such was the thought or intent of the parties, and we have so found as a fact. The fact that the agreement did not in words provide for the credit of any of the so-called rental payments toward a stated purchase price does on the surface suggest a distinction between the instant case and a number of decided cases where, by reason of a specific provision, the “rental” payments were to be applied on a stated purchase price. It is our opinion, however, that the distinction is one without a difference. Where under the factual situation presented it appears, as it does in this case, that the amount of “rent” paid prior to the exercise of the option to purchase is a factor in establishing the comparably small final amount required to exercise the said option and acquire title, the rental payments are, in substance, being as effectively applied to the purchase of the property, and the building up of an equity therein, as would be true in the case where the purchase price specified was in an amount which encompassed the “rental” payments as well as the final payment and the agreement specifically provided that the so-called rental payments were, upon the exercise of the option, to apply on the purchase price. That the R. F. C. would not have sold the New Albany plant and equipment for $50,000, or any comparable amount, is not, we think, open to doubt. In 1941, petitioner had made an offer of $100,000 for the one-third of the property which it then occupied, but to no avail. And according to a witness, offered by petitioner as an expert, the fair market value of the whole property at the time of the agreement, and including the land at $60,000, was $376,500, and the replacement cost, likewise including the land at $60,000, was $575,000. There is significance also, we think, in the fact that the property at the time of the agreement was insured for the principal sum of $325,000. The evidence does show, however, that the R. F. C. was primarily interested in selling the property and, for its own reasons, was willing to sell for a price of $150,000 to $185,000. Approximately a year prior to the agreement with petitioner, it had suggested, by letter, to a prospective customer that an offer of $175,000 might well be favorably received. And by its agreement with the petitioner, it bound itself to sell the property at the end of 5 years, upon the payment of $50,000, but only if monthly “rental” payments aggregating $100,000 had been received, thereby bringing the total payments for or on the property to $150,000; at the end of 6 years, upon the payment of $50,000, but only if monthly “rental” payments aggregating $120,000 had been received, bringing the total payments for or on the property to $170,000; at the end of 7 years, upon the payment of $37,500, but only if monthly “rental” payments aggregating $140,000 had been received, bringing the total payments for or on the property to $177,500; and at the end of 8 years, upon the payment of $25,000, but only if monthly “rental” payments aggregating $160,000 had been received, bringing the total payments for or on the property to $185,000. The monthly “rental” payments, according to the agreement, were to be net payments, in that petitioner was required to make all necessary payments for maintenance, repairs, and upkeep of the premises and equipment and to pay all taxes and insurance premiums thereon. Taking into account the property involved, its substantial value, the relatively small final payment required to exercise the option and acquire title, and the growing advantage or interest of petitioner therein or with respect thereto as each additional monthly payment was made, any difference, so far as we can see, between the instant transaction and an admitted conditional sale would be in the words used in drawing up the agreement, and not in the substance or practical effect. Furthermore, the provisions of the agreement covering the disposition of the insurance proceeds in case of loss of the property by fire, flood, or other casualty, offer corroboration, we think, for the conclusion that by and through the monthly “rental” payments petitioner was acquiring and building up an equity in the property, and that it was so regarded and intended by the parties. In the event of such loss, followed by a failure on the part of the E. F. 0. to repair or replace the buildings, machinery, and equipment, it was required under the agreement to pay over to petitioner the excess of the insurance proceeds over $150,000, if the loss occurred at any time prior to 5 years from the date of the agreement; $170,000, if the loss occurred subsequent to 5 years but prior to 6 years; $177,500, if the loss occurred subsequent to 6 years but prior to 7 years; and $185,000, if the loss occurred subsequent to 7 years but prior to 8 years. But in arriving at such excess, each such amount which the E. F. 0. was privileged to retain was to be reduced by the total amount of the “rental” payments which had theretofore been made by petitioner to the E. F. C. under the agreement. Considered in the light of the amount of the insurance carried on the property and the fair market value and replacement cost thereof at the date of the agreement, as testified to by petitioner and which it asks us to accept, the above disposition of the insurance proceeds is, in our opinion, convincingly indicative of the acquisition by petitioner of an equity in the property as each of the periodic “rental” payments was made.[2] In passing, it is to be noted also that even though, by the wording of the agreement, the “option to purchase” did not become available to petitioner until 30 days prior to the expiration of the fifth year of the agreement, or the sixth, seventh, or eighth year, if the agreement should be extended, and there was no provision for advancing those dates, nevertheless, the parties followed a course of conduct which was some indication of an understanding that the right to close the transaction accrued to petitioner when the $100,000 in “rental” payments had been made, regardless of whether the period specified for the exercising of the option had arrived. Almost a year and a half prior to the expiration of the fifth year, petitioner wrote the R. F. C. that the contract “calls for our option to purchase this property for $50,-000.00,” when $100,000 in “rental” payments had been completed, and that since it had substantially completed payments aggregating that amount, it desired to exercise its option immediately. The E. F. C. acknowledged petitioner’s request and the sale was completed within 30 days thereafter. See, in that connection, Helser Machine & Marine Works, Inc., supra. Based on the opinion of its witness that the fair market value of the property was $375,500, and the further opinion that a fair annual rental thereon was $45,000, petitioner, on brief, seeks to find in Chicago Stoker Corporation, supra, support for its position here, stating “it is clear that the annual rental payments [$20,000] were not large enough to exceed depreciation and the value of the property so as to give the petitioner an equity in the property.” The argument, in our opinion, is not well made. In the first place, the “rental” payments were net, after costs of maintenance and repairs and the payment of taxes and insurance premiums, and the price at which it was privileged to buy was neither the $376,500, regarded by petitioner as its fair market value, nor even $325,000, at which it was insured. In short, by its own contention as to fair market value, it would appear that petitioner, under the agreement herein, was acquiring the property at a bargain price, which would indicate all the more clearly that through its monthly “rental” payments it was building up a very dominant equity interest in the property during the contract period, and in Chicago Stoker Corporation, supra, the dominant or controlling factor was the building up of such an equity. That petitioner was acquiring and building up such an equity interest in the property herein is, in our opinion, even more pronounced than in those cases where the aggregate of the total payments, “rental” or otherwise, required for the purchase of the property approximated the fair market value thereof. The petitioner cites and relies on Benton v. Commissioner, 197 F. 2d 745, reversing a Memorandum Opinion of this Court entered September 20, 1950. Aside from its pronouncements as to applicable legal principles, the Court of Appeals, in that case and after reviewing the evidence, concluded as a fact that the conduct of the parties throughout was consistent with, a lease and that they had intended the contract as a lease, and that this Court’s finding of fact to the contrary was clearly erroneous. As indicated above, the evidence in the instant case will not, in our opinion, permit such a conclusion of fact. The contract was much more than a lease. By and through the so-called rental payments, the petitioner was in fact acquiring and building up a substantial equity in the property, and it was so intended and regarded by the parties, and what was said in Benton v. Commissioner, supra, does not apply here. The payments in question are accordingly not deductible under section 23 (a) (1) (A), supra, and the respondent did not err in disallowing the claimed deductions therefor. Decision will 5e entered u/nder Bule 50. SEC. 23. DEDUCTIONS EROM GROSS INCOME. In computing net income there shall be allowed as deductions : (a) Expenses.— (1) Trade or business expenses.— (A) In General. — * * * and rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity. Assuming a total loss of the property prior to 5 years from the date of the agreement but after petitioner had paid the entire $100,000 in so-called rental payments and a recovery under the policy of the entire $325,000, the net result -would have been $50,000 for the R. E. C. and $275,000 for petitioner, which according to the agreement would have given petitioner a recovery out of the insurance proceeds of the $100,000 of “rental” payments which had been made, plus the $175,000 of insurance proceeds remaining.