### D. M. HAGGARD AND NILA HAGGARD, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 50625. Filed September 28, 1955.

*W. Lee McLane, Jr., Esq.,* for the petitioners.
*Arthur Clark, Jr., Esq.,* for the respondent.

OPINION.

FISHER, *Judge:* The respondent has disallowed a deduction of a payment made by petitioners under a "Lease," executed in conjunction with an "Option" to purchase, on the ground that the payment was not rental expense within the meaning of section 23 (a) (1) (A) of the Internal Revenue Code of 1939, which restricts deductions to rentals or other payments for the use or possession of property "to which the taxpayer has not taken or is not taking title or in which he has no equity." The sole issue to be decided is whether the so-called "rental" payment was in fact a payment of rent under the lease and deductible as such, or a partial payment of the purchase price of the property. We hold for the respondent for the reasons stated hereinafter.

Petitioners contend that they did not acquire an equity interest in the property as a result of the $12,000 payment under the lease agreement because the fair market value of the property when the "Lease" was executed was considerably less than the agreed purchase price under the "Option." They further argue that only the economic relation of the value of the property existing at the time the documents were executed is determinative of the issue here, and that the intention of the parties is only supplemental, if relevant at all. The precise problem posed of characterizing a payment made pursuant to a lease-option arrangement has been before this Court on numerous occasions, and regardless of the form or nomenclature of the transaction, we have treated similar "rental" payments as partial payments of the purchase price of the property involved, if by virtue of the payment the taxpayer has acquired, or will acquire title to or an equity in the property. *Alexander W. Smith, Jr., Executor*, 20 B. T. A. 27 (1930); *Chicago Stoker Corporation*, 14 T. C. 441 (1950). The principle extending throughout the cases heretofore decided by us on like issues is that where the "lessee" as a result of the "rental" payment, acquires something of value in relation to the over-all transaction, other than the mere use of the property, he is building up an equity in the property, and the payments do not, therefore, come within the definition of rent in section 23 (a) (1) (A), *supra*. *Judson Mills*, 11 T. C. 25 (1948); *Truman Bowen*, 12 T. C. 446 (1949).

The most recent consideration of this issue was in *Breece Veneer & Panel Co.*, 22 T. C. 1386 (1954) (on appeal C. A. 7). There, petitioner entered into a "Lease" and "Option to Purchase" agreement with the R. F. C. with respect to certain property, in part of which it was at the time conducting its business. Under the agreement, petitioner was to pay "as rent" $100,000 in 60 monthly installments, after which it had the option to purchase the property for $50,000. The Court held, despite the explicit language of the lease agreement, that since the "rental" payments materially exceeded the current fair rental value of the property, and since the aggregate payments paid prior to the exercise of the option were disproportionate to the relatively small final amount required to acquire title, petitioner was building up a substantial equity interest in the property, as intended by the parties, and that the payments, in reality, were being applied to the agreed purchase price of the property. We are of the opinion that the rationale there expressed is applicable here. *Judson Mills*, *supra*; *Robert A. Taft*, 27 B. T. A. 808, 812 (1933); *Holeproof Hosiery Co.*, 11 B. T. A. 547 (1928).

We pointed out in *Breece Veneer & Panel Co.*, *supra*, and *Chicago Stoker Corporation*, *supra*, that the payments there in question (as in the instant case) may have dual potentialities, that is, they may

emerge as partial payments of the agreed purchase price on the one hand or rent for the use of the property on the other. As emphasized in those cases, it is difficult to categorize the payments for income tax purposes. To properly discern the true character of the payment, therefore, it is necessary to ascertain the intention of the parties as evidenced by the written agreements, read in the light of the attending facts and circumstances existing at the time the agreement was executed.

Here, the record shows that Butler had purchased the property in 1945 for $40,000. In 1948 he was primarily interested in selling it, and listed the property with a realty firm for a price of $48,000. At the time he contacted petitioners, he had an offer from the Talby group for that amount and was prepared to sell to them on the basis of a downpayment of $8,000 with the balance in 10 equal annual payments if he could not arrange with petitioners on more favorable terms at least as to deferred payments. The total sums paid by petitioners precisely equaled the same amount of $48,000, and we think it clear, upon consideration of the whole record, that at the time the agreements were executed, Butler would not have considered making an outright sale for $24,000. We likewise think it is clear that the payments in 1948 and 1949 were in excess of the fair rental value of the property and were fixed at amounts which, when added to the option payment of $2,000 and the ultimate "sale price" of $24,000, would equal the $48,000 which Butler demanded.

In support of petitioners' position that they did not acquire an equity in the property as a result of the "rental" payment, they argue that the fair market value was below a reasonable estimate of the property's future worth. They urge that the property on February 9, 1948, had a fair market value not in excess of $21,750 and the agreed purchase price established by the "Option" was $24,000. The figure of $21,750 urged as the fair market value was based upon the testimony of an expert witness produced by petitioners. An analysis of his testimony demonstrates that the valuation so suggested is not to be accepted as determinative. It is, of course, widely at variance with what both the Talby group and petitioners were willing to pay. The witness pointed out a number of circumstances which might have resulted in greatly differing valuations of the property as a whole, and a variance of as much as 100 per cent in rental value. Moreover, he testified that in valuing the property he had given no consideration to the significant factor of the right to the use of water which was essential to the productivity of the land. His reason for this omission was his assumption that such right was not "appertinent" to the land in question. He made it clear that if such right was appertinent, the value thereof must be *added* to his valuation of $21,750. He did

not, however, testify what the value of such a right was, and there is no other testimony in the record from which it might be determined, so that we have no basis on his evidence to find a total fair market value including such right.

The burden of proof was, of course, upon petitioners. The record fails to establish whether or not there was a right (appertinent to the land) to the adequate use of water. It is clear from a consideration of the whole record, however, that there was some arrangement for water supply which was satisfactory to petitioners. We add that we think it reasonable to assume that an experienced farmer like Haggard, who was familiar with the particular property, its requirements, and conditions in the area in which it was located, would not otherwise have entered into the transaction.

In view of the foregoing, we cannot accept the valuation suggested by the expert witness. On the other hand, while subject in each instance to some deferment of payment, we have a precise amount which two willing buyers were willing to pay, and which Butler, a willing seller, was willing to accept. For the purposes of this case we are not required to determine an exact valuation. No doubt the price of $48,000 may have been subject to some discount if the entire transaction had been for cash. We think it clear, however, that the value was much closer to $48,000 than it was to $21,750. Even if the discount for cash would have been as much as 20 per cent (which we doubt), the payments by petitioners in 1948 and 1949 would have been clearly in excess of fair rental value and would have served to create an equity in the property of which Haggard was in a position to avail himself under the terms of the agreements. We add that, while petitioners' expert witness testified to widely varying potential rental values depending upon varying circumstances, we think that, upon his testimony, the fair rental value, for the practical purposes confronting us, was not in excess of $5,000 for 1948 or 1949.

A significant aspect of the over-all transaction indicative of petitioners' intent to acquire an equity interest in the property is the fact that, under the lease, the aggregate of the "rental" payments constituted 91 per cent of the purchase price stated in the option. Moreover, the total of annual "rental" payments of $22,000 is about 46 per cent of the total considerations passing from Haggard to Butler under the terms of the contracts. We think it evident that a rental charge so disproportionate to the term of user in relation to the fair market value of the property is suggestive of the acquisition of an equity interest. *Truman Bowen, supra*, 463.

Petitioners rely strongly upon *Benton* v. *Commissioner*, (C. A. 5, 1952) 197 F. 2d 745, 751. The factual situation in the instant case differs materially from that in the *Benton* case, which, in our opinion, is not here controlling.

In the light of the foregoing and upon consideration of the record as a whole, we are convinced that through the annual rental payments petitioners were in fact acquiring a substantial equity in the property, and that it was so intended by the parties. Accordingly, we hold that the payment in question is not deductible under section 23 (a) (1) (A), *supra*, and the respondent did not err in disallowing the claimed deduction therefor.

*Decision will be entered under Rule 50.*