T.C. Memo. 1998-408


UNITED STATES TAX COURT


SALVADOR A. AND KATHLEEN M. GAUDIANO, ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 25712-96, 25713-96,      Filed November 13, 1998.
              25714-96, 25716-96.


William C. Myers, Jr., for petitioners.

Rebecca Dance Harris, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


VASQUEZ, Judge:  Respondent determined the following

deficiencies in petitioners' 1993 Federal income taxes:

            Petitioner                          Deficiency

---

1 Cases of the following petitioners are consolidated
herewith:  Gary D. Asher, docket No. 25713-96; Larry A. Asher,
docket No. 25714-96; and Randy C. and Kathleen R. Edgemon, docket
No. 25716-96.

| Salvador A. and Kathleen M. Gaudiano (S. and K. Gaudiano) | $43,665 |
| Gary D. Asher (G. Asher) | 43,281 |
| Larry A. Asher (L. Asher) | 43,858 |
| Randy C. and Kathleen R. Edgemon (R. and K. Edgemon) | 44,342 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The issues for decision are: (1) Whether petitioners[2] are entitled to increase their bases in the stock of Four A Coal Co. (Four A), an S corporation, by their pro rata share of discharge of indebtedness income (COD income) realized by Four A but excluded by Four A pursuant to section 108(a); (2) whether the transfer of certain mining equipment by Four A constituted a sale or a lease and, if a sale, then the amount realized on the sale; (3) whether G. Asher and L. Asher are entitled to ordinary losses related to an alleged bad debt deduction claimed by Appolo Fuels, Inc. (Appolo), an S corporation, for loans made to Four A.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. S. and K. Gaudiano and R. and K. Edgemon resided in Knoxville, Tennessee, at the time they

---

[2] We use the term "petitioners" to refer to S. Gaudiano, G. Asher, L. Asher, and R. Edgemon.

filed their petitions.  G. Asher resided in Middlesboro, Kentucky, at the time he filed his petition, and L. Asher resided in Speedwell, Tennessee, at the time he filed his petition.

I.  Increase in Basis of Four A Stock

During 1993, petitioners were shareholders of Four A, an S corporation.  Petitioners each held a 25-percent interest in Four A.

During 1993, Four A had COD income of $1,289,048.  On December 3, 1993, Four A filed for bankruptcy and was insolvent within the meaning of section 108(d)(3).  On its Form 1120S for 1993, Four A excluded the COD income under section 108(a). During that year, each petitioner increased his basis in his Four A stock by $322,262--this represented his pro rata share of Four A's COD income for the year.

II.  Increased Section 1231 Loss

From May 1988 through February 1991, Four A mined coal which it sold to Appolo.  Four A ceased its mining operations in February 1991, and it leased its mining equipment (the equipment) to Black Mountain Coal Mining Co., Inc. (Black Mountain). Pursuant to the lease with Black Mountain (the lease), Black Mountain mined the coal seams formerly mined by Four A and sold the coal to Appolo.  Appolo paid Black Mountain a certain price per ton for coal produced and paid Four A 50 cents per ton of coal produced as a fee for Black Mountain's use of the equipment.

Under the terms of the lease, Four A retained title to the equipment.

During 1993, Four A and Black Mountain entered into a new agreement concerning the equipment referred to by the parties as a "Promissory Note and Agreement" (the agreement). According to the terms of the agreement, Four A granted, sold, and conveyed all of its right, title, and interest in and to the equipment to Black Mountain. Four A retained a security interest in the equipment as protection against nonpayment by Black Mountain.

The agreement required Black Mountain to pay a total purchase price of $445,000 for the equipment. The purchase price was to be paid monthly out of Black Mountain's production at a rate of 17 cents per ton of coal produced in the preceding month.

The agreement also provided that if Black Mountain failed to make production payments, then the entire indebtedness became immediately due and payable. In such event, Black Mountain could retain the equipment by paying the balance of the debt. If Black Mountain chose not to pay the remaining balance, it was required to return the equipment to Four A. The agreement provided that the debt was nonrecourse. In late 1995 or early 1996, Black Mountain ceased making production payments and surrendered the equipment to Four A. The equipment was ultimately sold to a third party.

On its Form 1120S for 1993, Four A reported the transfer of the equipment as a sale and reported the amount realized on the sale as $445,000 (the total purchase price under the agreement). This resulted in a section 1231 loss of $275,006. In 1996, Four A filed an amended Form 1120S which reported the amount realized on the sale as $145,430. This increased the section 1231 loss to $574,576. In 1996, petitioners filed Forms 1040X seeking refunds for 1993 based on their pro rata shares of the increased section 1231 loss from Four A.

III. Business Bad Debt Deduction

From 1988 to May 6, 1991, Four A sustained substantial losses, and Appolo advanced significant amounts of money to Four A on a demand basis for the working capital needs of Four A (Four A debt). During 1993, G. Asher and L. Asher were shareholders of Appolo, each owning 24 percent of its outstanding shares. John Asher, their father, was the majority shareholder of Appolo.

In March 1991, Price Waterhouse LLP (PW) audited Appolo's 1990 financial statements. During the audit, PW questioned the collectability of the Four A debt and suggested that Appolo establish a reserve against the Four A debt. PW and S. Gaudiano, acting in his capacity as the chief financial officer of Appolo, reached an agreement whereby petitioners, acting in their capacity as Four A shareholders, would execute guaranties to

Appolo for the Four A debt, and Appolo would not be required to establish a reserve against the Four A debt.

On or about May 13, 1991, petitioners executed two guaranty agreements. Both guaranties stated that they were supported by adequate and sufficient consideration. The first guaranty covered all loans made by Appolo to Four A in the past and to be made in the future. The first guaranty stated that it was given for good and valuable consideration and "as consideration for Appolo not demanding immediate payment of its existing loans to Four A and as an inducement to Appolo to make future advances to Four A".

At the time of Four A's bankruptcy in 1993, Four A owed $1,106,000 to Appolo. In 1993, Appolo wrote off the Four A debt as a business bad debt under section 166 without ever demanding payment from either Four A or the Four A shareholders. As a result, on their respective 1993 Federal income tax returns, G. Asher and L. Asher each reported an ordinary loss of $80,246 as their distributive share of Appolo's bad debt deduction. During 1993, the Four A shareholders had the financial ability to honor the guaranties, and they currently still have such ability.

OPINION

I. Basis in Four A Stock

Petitioners argue that they are entitled to increase their bases of their Four A stock as a result of Four A's 1993

realization of COD income that was excluded under section 108(a). After the initial briefs were filed by the parties, Nelson v. Commissioner, 110 T.C. 114 (1998), was released by the Court. In his reply brief, respondent relies upon Nelson. Petitioners do not attempt to distinguish Nelson from the instant case but instead assert that Nelson was incorrectly decided.

In Nelson, we held that COD income realized and excluded from gross income under section 108(a) does not pass through to shareholders of an S corporation as an item of income in accordance with section 1366(a)(1) so as to enable an S corporation shareholder to increase the basis of his stock under section 1367(a)(1). We held in that case that section 108 is not designed or intended to be a permanent exemption from tax. Id. at 125. Excluded COD income is not "tax-exempt" pursuant to section 1366(a)(1) and, thus, is not statutorily required to pass through to the S corporation shareholders. Id.

We see no need to repeat our detailed analysis on this issue contained in Nelson. See Friedman v. Commissioner, T.C. Memo. 1998-196; Chesapeake Outdoor Enters., Inc. v. Commissioner, T.C. Memo. 1998-175. We hold, following Nelson, that the COD income in the amount of $1,289,048 that Four A excluded from gross income under section 108(a) is not a separately stated item of tax-exempt income for purposes of section 1366(a)(1)(A).

Therefore, petitioners are not entitled to increase their bases in the Four A stock due to Four A's COD income.

## II. Increased Section 1231 Loss

In 1996, petitioners filed claims for refund for their distributive shares of the increased section 1231 loss claimed by Four A on its 1993 amended Form 1120S. Respondent argues that (1) the transaction was a lease and not a sale, and (2) if it was a sale, the amount realized from the sale should be $445,000, the amount originally reported by Four A on its return, instead of $145,430 as reported by Four A on its amended return.

### A. Sale v. Lease

In 1993, Four A and Black Mountain executed a new agreement concerning the equipment. The agreement characterized the transaction as a sale of the equipment.

It is well settled that the economic substance of transactions, rather than their form, governs for tax purposes. Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1236 (1981). In deciding whether a transaction constitutes a sale for tax purposes, we consider whether the burdens and benefits of ownership have passed to the purported purchaser. See id. at 1237. This is a question of fact to be ascertained from the intentions of the parties as evidenced by the written agreements read in the light of the attending facts and circumstances. Id. In ascertaining such intent, no single factor, or any special

combination of factors, is absolutely determinative. Cal-Maine Foods, Inc. v. Commissioner, T.C. Memo. 1977-89; see also Western Contracting Corp. v. Commissioner, 271 F.2d 694 (8th Cir. 1959); Benton v. Commissioner, 197 F.2d 745 (5th Cir. 1952); Haggard v. Commissioner, 24 T.C. 1124 (1955), affd. per curiam 241 F.2d 288 (9th Cir. 1956).

In Grodt & McKay Realty, Inc. v. Commissioner, supra at 1237-1238, we listed several factors considered by courts in determining whether the benefits and burdens of ownership have been transferred. The factors considered were:

> (1) Whether legal title passes; (2) how the parties treat the transaction; (3) whether an equity was acquired in the property; (4) whether the contract creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments; (5) whether the right of possession is vested in the purchaser; (6) which party pays the property taxes; (7) which party bears the risk of loss or damage to the property; and (8) which party receives the profits from the operation and sale of the property. [Citations omitted.]

### 1. Whether Legal Title Passed

We look to State law to determine whether a taxpayer has an ownership interest in property. See United States v. National Bank of Commerce, 472 U.S. 713 (1985). Under Kentucky law, "title to goods passes * * * in any manner and on any conditions explicitly agreed on by the parties." Ky. Rev. Stat. Ann. sec. 355.2-401(1) (Michie 1996). Petitioners argue that under the agreement Four A granted, sold, and conveyed all of its right,

title, and interest in and to the equipment to Black Mountain. Respondent argues that there is no evidence that legal title was actually transferred to Black Mountain and points out that no bill of sale was given to Black Mountain.

The parties to the agreement designated that title passed with the signing of the agreement, and under Kentucky law, the parties' designation controls. We conclude that legal title passed to Black Mountain on the execution of the agreement.

### 2. How the Parties Treated the Transaction

Four A recorded the transaction as a sale in its bankruptcy filings and ceased taking depreciation deductions related to the equipment after executing the agreement. Respondent argues that Black Mountain treated the transaction as a lease and relies on the testimony of William Phipps, president of Black Mountain, for this proposition. Mr. Phipps testified that the transaction was a "lease purchase" and not a sale. However, during cross-examination, Mr. Phipps admitted that he did not know the difference between a lease purchase and a sale agreement and that the purpose in executing the note was to gain ownership of the equipment. Mr. Phipps also conceded that his partner, Mr. Donovan, did most of the negotiating with Four A regarding the equipment.

We find that the parties to the agreement treated the transaction as a sale.

3. <u>Other Factors</u>

The parties failed to present evidence regarding which party bore the risk of loss or damage to the equipment. Under the agreement, Four A had a present obligation to convey title to Black Mountain (as noted above), and Black Mountain had a present obligation to make production payments to Four A in order to retain the equipment. Additionally, Black Mountain had possession of the equipment. Black Mountain was required to return the equipment to Four A if it stopped making production payments and failed to pay the remaining balance due under the agreement.

4. <u>Conclusion</u>

Based on our review of the relevant <u>Grodt & McKay Realty</u> factors, we conclude that the transaction concerning the equipment constituted a sale by Four A.

B. <u>Amount Realized From the Sale</u>

On Four A's Form 1120S for 1993, Four A reported the amount realized on the sale of the equipment as $445,000. In 1996, Four A filed an amended Form 1120S that reported the amount realized on the sale as $143,430. This increased Four A's section 1231 loss to $574,576. Petitioners filed Forms 1040X seeking refunds for 1993 based on Four A's increased section 1231 loss.[3]

---

[3] We note that petitioners never received any response from respondent regarding their amended Forms 1040X and that this
(continued...)

Section 1001(b) provides that "The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received." Petitioners argue that under section 1.1001-1(g)(2), Income Tax Regs., Four A was entitled to report the amount realized on the sale as the present value of the productions payments to be made under the agreement.

In 1996, final regulations were issued providing a method for calculating the amount realized from a contingent payment debt instrument. Sec. 1.1001-1(g)(2), Income Tax Regs. Treasury Decision 8674, explaining the final regulations, provides in part:

> For a contingent payment debt instrument issued before August 13, 1996, a taxpayer may use any reasonable method to account for the debt instrument, including a method that would have been required under the proposed regulations when the debt instrument was issued. * * * [T.D. 8674, 1996-2 C.B. 84, 89.]

The agreement for the sale of the equipment was executed in 1993, before the effective date of the 1996 regulations. Petitioners contend, as we understand it, that Four A received, in exchange for the equipment, a contingent payment debt instrument within the meaning of the regulations. Even if we

---

[3](...continued)
issue was not included in the statutory notices of deficiency or in the petitions. We find that the issue was tried by consent pursuant to Rule 41(b)(1), and we consider it to be before the Court.

accept that premise arguendo, petitioners bear the burden of proving that the method they used to compute the amount realized was reasonable in light of the facts and circumstances.

S. Gaudiano testified that he computed the amount realized of $145,430 on Four A's amended Form 1120S using two different methods: (1) A balloon payment calculation using a normal banking rate of 11-1/4 percent and (2) a junk bond calculation using a 24- to 25-percent discount rate. S. Gaudiano testified that the two methods reached similar results.

Neither Four A nor petitioners showed the present value calculations on their amended returns, and during his testimony S. Gaudiano failed to explain to the Court how either of his two alleged methods arrived at an amount realized of $145,430. From the record, we are unable to discern the specific methodology employed by S. Gaudiano in making the present value calculations. Thus, petitioners have failed to establish that the method they used to compute the amount realized of the note was reasonable or had a basis in fact. We conclude that petitioners have not established that they are entitled to increase their section 1231 losses relating to the sale of the equipment by Four A.

III. Bad Debt Deduction

From 1988 to May 6, 1991, Appolo advanced significant amounts of money to Four A for its working capital needs. In 1991, petitioners, in their capacity as Four A shareholders,

executed two personal guaranty agreements that covered the debt Four A owed to Appolo. In 1993, Four A declared bankruptcy, and Appolo wrote off the Four A debt and claimed a bad debt deduction under section 166. As a result, on their respective 1993 Federal income tax returns, G. Asher and L. Asher each reported ordinary losses of $80,246 as their distributive share of Appolo's bad debt deduction.

In the answer, respondent, for the first time, disallowed these ordinary losses and asserted increased deficiencies in the income taxes of G. Asher and L. Asher. When a new matter is pleaded in the answer, the burden of proof for that issue is on respondent. Rule 142(a).

If Appolo is entitled to a bad debt deduction, then G. Asher and L. Asher are entitled to ordinary losses related to their distributive shares of the deduction. Respondent argues that Appolo is not entitled to a bad debt deduction under section 166 for the Four A debt because the Four A shareholders signed personal guaranties and had the financial ability to repay the Four A debt; therefore, the debt was not worthless as required under section 166. G. Asher and L. Asher argue that the guaranties were not supported by adequate and sufficient consideration and are not enforceable; therefore, the debt is worthless, and Appolo is entitled to a bad debt deduction.

On their face, the guaranties appear valid and enforceable. Both guaranties stated, on their face, that they were supported by adequate and sufficient consideration. The first guaranty stated that it was supported by two forms of consideration: (1) Appolo's promise not to demand immediate payment on past loans made to Four A, and (2) Appolo's promise to make future loans to Four A.[4]

It is well settled under Kentucky law that forbearance to sue is a sufficient consideration to support a promise. Sellars v. Jones, 175 S.W. 1002, 1003 (Ky. Ct. App. 1915). The first guaranty stated that Appolo promised to forbear suing Four A on Four A's past debt; thus, the first guaranty was supported by adequate and sufficient consideration and is enforceable.

G. Asher and L. Asher argue that although the guaranty recites that Appolo promised to forbear suing Four A on Four A's past debt, Appolo never actually made such a promise to the Four A shareholders. The only evidence submitted by petitioners to disprove the existence of that promise was their own self-serving testimony. Under these circumstances, we are not required to and do not accept the self-serving testimony of petitioners. See Tokarski v. Commissioner, 87 T.C. 74 (1986).

---

[4] By its terms, the first guaranty covers all loans made by Appolo to Four A. If the first guaranty is enforceable, then the debt is not worthless regardless of whether the second guaranty is enforceable, and Appolo is not entitled to a bad debt deduction for the debt.

We conclude that the first guaranty was supported by adequate and sufficient consideration and was enforceable. Therefore, Appolo is not entitled to a bad debt deduction for the Four A debt, and, accordingly, G. Asher and L. Asher are not entitled to ordinary losses related to the bad debt deduction.

To reflect the foregoing,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.