George S. Lensing and Opal Lensing v. Commissioner.
Lensing v. Commissioner
Docket No. 68912.
United States Tax Court
T.C. Memo 1961-268; 1961 Tax Ct. Memo LEXIS 80; 20 T.C.M. (CCH) 1399; T.C.M. (RIA) 61268; September 28, 1961
*80 Petitioner discussed selling his plantation with a prospective buyer, and after some bargaining the parties arrived at a price of $115,000. The prospective buyer, intending to place all of his available cash into permanent improvements on the plantation, was unable to pay any money down on the purchase price. There were no discussions concerning the leasing of the plantation nor its rental price, although the buyer stated that he could pay $25,000 annually for two years before the title would be transferred. The parties thereupon entered into a so-called two-year lease agreement with an option to purchase the property for $115,000. The two annual payments of $25,000 were to be applied in full to the purchase price, and the balance was to be paid by the assumption of any existing mortgages and the creation of an additional mortgage in a total amount equalling the balance of the purchase price. The option could have been exercised at any time upon the payment of $50,000. The lease-option contract was drafted by petitioner's attorney who advised the use of the form to afford petitioner greater security. Held: Upon consideration of all the circumstances including those surrounding the *81 execution of the contract and the economic factors involved, that the parties intended to create in the "lessee" an equity interest in the plantation upon each $25,000 payment. Held, further: That the two payments of $25,000 each were payments on account of option to purchase to be applied to the ultimate purchase price and were not rental payments. Robert Lee Curry, III, Esq., and Maurice Glazer, Bernhardt Bldg., Monroe, La., C.P.A., for the petitioners. E. J. Eagleton, Esq., for the respondent. FISHER
Memorandum Findings of Fact and Opinion FISHER, Judge: The respondent determined deficiencies in petitioners' income tax for the taxable years 1951 and 1952 in the amounts of $7,580.39 and $9,963.58, respectively, on the ground that the receipt of $25,000 during each of the years in issue, pursuant to a so-called lease-option agreement, was rental income rather than payments on an installment sale as reported by petitioner. The sole issue presented for our decision is whether the amounts received by petitioner were rentals, as determined by respondent, or whether they represented payments on account of an option and ultimate purchase price, as contended by *82 petitioner. Findings of Fact Some of the facts are stipulated and are incorporated herein by this reference. George S. Lensing (hereinafter referred to as the petitioner) and Opal Lensing are husband and wife residing in Lake Providence, Louisiana. They filed an original and an amended joint income tax return for the calendar year 1951 with the collector of internal revenue, New Orleans, Louisiana. For the calendar year 1952, they filed a joint income tax return with the director of internal revenue, New Orleans, Louisiana. They reported their income on a cash receipts and disbursements basis for the calendar years in issue. The petitioner has been president of the Lake Providence Bank, Lake Providence, Louisiana, since 1946. In 1948, petitioner acquired title with another person to a 1,014.75-acre tract, with improvements, in the Parish of East Carroll, Louisiana, known as the Lewiston & Kerr Plantation (hereinafter sometimes referred to as the plantation). Petitioner subsequently acquired complete ownership of the plantation. His total investment, including the cost of subsequent permanent improvements, was approximately $65,000. In 1949, petitioner operated a small dairy *83 farm and engaged in some farming on the plantation. His activities were, however, not financially successful. He then attempted to sell the plantation for $100,000, and listed it with a real estate agent. An offer of approximately $90,000 was received but no sale was effected that year. In the fall of 1949 petitioner leased to a rice farmer approximately 100 acres of the plantation located adjacent to the irrigation facilities for a cash rental of $1,500, or $15 per acre. Petitioner again farmed the plantation in 1950, but once again without financial success. In the fall of that year petitioner offered to lease the entire plantation to the same rice farmer for a cash rental of $10,000, or $10 per acre. The offer was rejected because the farmer did not believe that there were adequate water facilities available to enable him to use the entire plantation for rice farming. The fair rental value of the property was, however, approximately $10 per acre at that time. Petitioner again attempted to sell the plantation, this time for $120,000. During the middle of November 1950, Henry H. Tomlinson and his son, Walter, (hereinafter referred to individually as Henry and Walter, respectively, *84 or the Tomlinsons, collectively) became interested in producing rice on the plantation. Henry, an Arkansas resident, came to Lake Providence to see the plantation and petitioner, at which time he expressed an interest to petitioner and to an adjoining landowner concerning the purchase of the plantation. Petitioner informed Henry that his price for the entire plantation was $120,000. After some bargaining concerning the mineral rights to be reserved by petitioner, petitioner agreed to lower the price to $115,000, which was agreeable to Henry. There were no discussions between the two concerning the leasing of the plantation or a rental price. Henry informed petitioner that the only cash he had available was $20,000 which he needed for building the necessary wells and irrigation canals to convert the plantation into a rice farm. Henry, however, stated that he would be able to pay $25,000 a year for two years, and it was agreeable to both that at the end of two years the title would be transferred to Henry upon his assumption of mortgages covering the balance of the purchase price. Shortly thereafter, the parties executed a contract which was drafted by petitioner's attorney providing, *85 in part, as follows: * * *
The term of this lease contract is hereby expressly declared by the parties hereto to be for a period of two (2) calendar years, that is, beginning on and with the 1st day of January, in the year 1951, and terminating on and with the 31st day of December, in the year 1952. The said Henry Tomlinson, said Lessee, hereby binds and obligates himself, his heirs and assigns, to cultivate and operate said leased premises in a husbandlike manner and to return said premises and buildings located thereon to the Lessor herein upon the expiration of this said lease contract in as good condition as when received by him, reasonable wear and tear and acts of God hereby expressly excepted. The price and consideration of this said lease contract is hereby expressly declared by the parties hereto to be either the full sum and price of FIFTY THOUSAND AND NO/100 ($50,000.00) DOLLARS or ONE-FOURTH (1/4) of all crops raised on the subject property during the term of this lease, whichever is greater, to be paid by the Lessee, said Henry Tomlinson, in the following manner, at the following times and in the following amounts; Twenty-five Thousand and No/100 ($25,000) Dollars *86 per year, or one-fourth (1/4) of the value of all crops raised on the subject property during the year, whichever is greater, payable on or before the 1st day of December in each of said years 1951 and 1952. In evidence of said indebtedness and the price of said lease, the said Henry Tomlinson, said Lessee, has made, executed, signed and issued his two (2) certain promissory notes, each dated at Lake Providence, Louisiana, on November 29, 1950, each of said notes being made payable to his own order and by the said maker endorsed in blank, each of said notes being in the principal amount of Twenty-five Thousand and No/100 ($25,000.00) Dollars, said notes being numbered "One" and "Two", and being made payable on or before the 1st day of December, in the year 1951, and on or before the 1st day of December, in the year 1952; * * *
It is understood and agreed by and between the parties hereto, and it is hereby expressly stipulated and made a condition of this contract, that the default or failure of the Lessee herein, said Henry Tomlinson, in promptly paying in full the first of the said above described two (2) rent notes shall immediately render the remaining note, otherwise subsequently *87 maturing, due and exigible, irrespective of the date of maturity therein stipulated or heretofore set out in this act, at the sole and exclusive option of the Lessor herein, or of the then lawful holder or holders of said note, and this lease contract shall, in such event, then be immediately exigible for the whole of the indebtedness secured thereby. IN ADDITION to the above lease contract and agreement, the Lessor herein, said George S. Lensing, does hereby grant unto said Lessee, said Henry Tomlinson, an option to purchase the hereinabove described and hereby leased premises at any time within the calendar years of 1951 and 1952, so long as this lease shall remain in full force and effect, and in the event this said option be exercised by the said Henry Tomlinson, during said years, does hereby agree and bind himself by this act and these presents, to bargain, sell, transfer, convey and deliver unto him, the said Henry Tomlinson, by full Warranty Deed with Assumption of Mortgage and Mortgage that property described as First and Second hereinabove, more particularly and commonly known and referred to as Lewiston and Kerr Plantations, for the price and on the terms and conditions *88 hereinafter set out; said deed and transfer to convey all the rights, ways, means, privileges and appurtenances belonging or in any manner appertaining to said property. * * *
It is understood and agreed by and between the parties hereto, and it is hereby stipulated and made a condition of this agreement, that all taxes on the above described property which accrue during the term of this lease agreement will be paid by the Lessee herein, and that said Lessee will keep all buildings located and situated on the subject property fully insured as same are now insured, during the term of this said lease. It is agreed and understood by and between the parties hereto, and it is hereby made a condition of this contract, that in the event there shall be any destruction, either partial or complete, of any of the buildings or improvements situated on the above-described lands, and all of which are included with the property covered by the within option, before the execution and delivery of an Act of Sale of said property, the price of said property shall suffer no dimunition on that account; but, in the event the Lessor herein shall collect any insurance because of such destruction, *89 the said Henry Tomlinson shall be entitled to the amount thereof by deducting same from the credit portion of the purchase price as hereinafter set out. The total price for which the hereinabove described real estate is to be sold and conveyed in event this said option be exercised by the said Henry Tomlinson is hereby declared by the parties hereto to be the total sum and price of ONE HUNDRED FIFTEEN THOUSAND AND NO/100 ($115,000.00) DOLLARS, to be paid and payable as follows, to-wit: FIRST: All amounts paid in as rent under the above and foregoing lease contract will be credited on said purchase price as a cash payment thereof provided that at least the sum of Fifty Thousand and No/100 ($50,000.00) Dollars has been paid prior to the exercise of said option. SECOND: By the assumption of the entire balance due on any mortgage which rests and bears against said property at the time the said option is exercised. THIRD: By the Purchaser giving Seller a second mortgage and Vendor's Lien and Privilege on the subject property to secure the entire balance of the purchase price of said property. It is agreed between the parties hereto that the notes representing the amounts due under *90 and secured by the aforesaid second mortgage will be of such amounts and due at such times as to limit the total amounts due each year by the said Henry Tomlinson on all mortgages will not exceed the sum of Six Thousand and No/100 ($6,000.00) Dollars exclusive of interest. Said act of sale with assumption of mortgage and mortgage is to be drawn in the form of an authentic act, and said above mentioned second mortgage notes are to be properly identified by the paraph of the Notary Public before whom such act of sale with assumption of mortgage and mortgage is executed in accordance with the laws of the State of Louisiana; and said instrument is to contain all clauses usual and customary under the laws of the State of Louisiana for inclusion in such contracts, including a confessing of judgment, waiver of appraisement, etc. It is agreed and understood between the parties hereto that this option to purchase shall be absolute and irrevocable, and neither party hereto shall have the right to recede from the obligations herein provided for, and each party shall have the right to compel specific performance on the part of the other party hereto; and each of said parties hereto is hereby *91 bound and obligated to comply with every obligation herein undertaken by said party and to do everything necessary to be done on his part in order to complete the agreement hereinabove set forth. It is finally understood and agreed between the parties hereto that the option provisions hereof will automatically terminate with the termination of the said lease regardless of the time thereof; and it is further agreed that the Lessee herein shall not have the right to cede this lease or to sublease said leased premises or any part thereof, or to sell or assign any rights in and to the above option without the written consent thereto of said Lessor. * * *
In order to protect Henry in the event the underground water supply was insufficient for rice farming, petitioner, that same day, signed a letter agreeing to destroy the above contract if testing in the manner provided for in the letter disclosed an insufficient water supply. Pursuant to the contract, Henry and Walter executed two notes, each in the amount of $25,000 payable on December 1, 1951, and 1952. The notes indicate that the amounts were made payable "for rent," and no interest was provided for except after maturity. *92 The Tomlinsons thereupon took possession of the plantation, made the necessary improvements concerning the irrigation facilities, and removed a substantial amount of fencing encircling the property. Pursuant to the contract, Henry paid all of the insurance premiums and taxes concerning the plantation. On March 4, 1951, petitioner increased the existing first mortgage on the plantation pursuant to an application for increase which was made by him before the contract in issue was executed. Henry was notified of this but was not made a party to this transaction. In the spring of 1951 Henry applied for a crop loan to the Lake Providence Bank in the amount of $25,000. Because of the large amount involved, petitioner, as president of the bank, wishing to have another bank participate in the loan, wrote a letter to the Union Planters National Bank and Trust Company which stated, in part, as follows: You will recall that on your visit to Lake Providence, I mentioned to you the possibility of securing your help in participation in a loan to Mr. Henry Tomlinson and Mr. Walter Tomlinson, for a 1951 crop production purposes. This man is renting my farm here and has an option to buy. The *93 amount of the loan is $25,000 and I would like to have you participate with us to the extent of 50% of the loan, or $12,500.00. In this connection I enclose a copy of the note; a copy of the chattel mortgage and 1951 crop lien; a copy of rent waiver in favor of the bank, and a copy of the crop lien and chattel mortgage certificate, together with a copy of Mr. Tomlinson's financial statement. This man anticipates planting some 800 acres in rice as well as 300 acres in cotton, 300 acres of the rice and 100 acres of the cotton are already planted and up to a good stand. The prospects at this time appear to be favorable. Mr. Tomlinson came to East Carroll Parish from Lonoke, Arkansas. I have checked on him through 1st State Bank at Lonoke, Arkansas; the Citizens Bank at Carlisle, Arkansas, and the Lonoke Production Credit Association of Lonoke, Arkansas, all of whom have recommended him highly as a desirable credit risk. The First State Bank of Lonoke, mentions that he is thoroughly honest and that they have never heard of his failure in paying any indebtedness. The Citizens Bank of Carlisle, mentions that he has made a remarkable success in farming operations. The Lonoke Production *94 Credit Association mentions that they consider him one of their better rice farmers, and that he has been prompt in paying his account with them. If there is any further information you wish in this connection and if you find that this loan is in order, kindly mail to us a participation certificate in order that we may sign it and return it to you. * * *
The crop loan was thereupon executed by the two banks and later increased in the fall of 1951 to $38,000. Petitioner, to induce the loans' approval by the banks, subordinated his prior lessor's lien on the crops grown on the plantation. Petitioner did not go to the plantation during the year 1951. He flew over it once, however, with Henry to view the crops. On December 1, 1951 (the due date of the first note) there was no payment made, and the Tomlinsons still owed a balance of $10,500 on the crop loan. A few days later, petitioner informed Henry and Walter that under the terms of the contract the option to purchase was no longer in force. Shortly thereafter, petitioner informed Walter that he would reinstate the option to purchase clause in the agreement upon the late receipt of the first $25,000 payment, and he would *95 also personally assume the $10,500 balance on the crop production loan. Pursuant to the agreement, the Tomlinsons paid petitioner $25,000 on December 27, 1951, and the first note was marked timely paid. In February of 1952, the Tomlinsons paid petitioner $4,000 on the crop loan, leaving a balance of $6,500. However, they were still in need of added cash for their 1952 crop. Application was made by them to a loan company which required that petitioner waive his lessor's lien before it would negotiate the loan. Petitioner, in response to this request, sent a letter dated March 4, 1952, to the Tomlinsons, stating: After giving your financing problem considerable thought, and discussing it with one of my advisors, I have concluded that if I am to waive rents due me then also you are to waive any option to purchase my farm. On this basis I would be willing to reduce the rent to $12,000.00 per year for the years 1952 and 1953, and at the same time waive my rent for a crop loan up to $20,000.00. I would be willing to carry the note that you now owe me until such time as the equity from the rice comes, or until such time as you would be able to pay me out of the 1952 crop. At the end of *96 the year 1953, I would insist that the land be leveled again and the wells stay as they are. By the above rental contract you would be in position to work out any investment you now have on the farm. Then too, at the end of 1953, it is quite possible that we could agree on an outright sale of the farm, by virtue of a down payment in cash. In addition to the waiver of rent I would be agreeable to subordinating my mortgage on the chattels in favor of the Production Credit in order to induce them to finance your 1952 crop. The entire transaction has not worked out as I had hoped it would, or as we had contracted originally. I do not care to continue on a rent purchase contract when I can expect a sale only under the most favorable crop circumstances and support prices. I believe that operating the farm as a rice farm for three years, much of the productivity and fertility of the soil is gone and the farm must be built back. Prior to the time you moved on the farm I had some 500 acres of improved pasture growing or planted, all of which is now destroyed. All fences likewise have been removed, and if everything is not entirely favorable I would quite possibly have the farm back next *97 year where it would take two or three years to build it back as when you first moved on it. If you will look at the entire transaction from an impartial standpoint you can only agree that I did all that I could to help you make your crop last year, in order that you might be in position to exercise your option. I do not believe that you can honestly complain about the help that I gave you in financing and co-operating with you in every way. Since it did not work out I therefore can not and will not continue on the same basis where you have everything to gain and very little to lose, and where I have much to lose and little to gain. * * *
In April of 1952, the balance of the crop loan was fully paid. On November 20, 1952, the second note for $25,000 was paid to petitioner, and title to the property was conveyed by petitioner to the Tomlinsons. The contract of sale entered into that day provided, in part, as follows: * * *
The price of this sale is declared by the parties hereto to be the total sum and price of One Hundred Fifteen Thousand and No/100 ($115,000.00) Dollars, paid and payable as follows, to-wit: First: Fifty Thousand and No/100 Dollars of said purchase *98 price has been paid in cash by the vendees to the vendors herein at the execution hereof, the receipt of which is hereby acknowledged and full discharge and acquittance granted therefor; the same having been paid $25,000.00 on December 1, 1951, and $25,000.00 on November 20, 1952, as rent for the within described property credited on the purchase price hereof. * * *
The parties hereto then declared that this Act of Sale with Assumption of Mortgage and Mortgage with Vendor's Lien and Privilege Retained is executed in accordance with the terms and provisions of a Lease Agreement with Option to Purchase entered into by them under date of November 29, 1950, * * * and that all provisions and obligations thereof have been fully complied with to the satisfaction of all parties. * * *
In their joint income tax returns for the calendar years 1951 and 1952 the petitioners reported the payments of $25,000 received during each of the years from the Tomlinsons, as proceeds from the sale of real estate, and computed the gain on the installment basis. For the calendar year 1951, a full year's depreciation concerning the plantation was deducted. This was done on advice of petitioner's *99 accountant, whose reason was that the first $25,000 was not paid until December 27, 1951. No depreciation was deducted concerning the plantation in 1952. In determining the deficiencies for the calendar years 1951 and 1952, the respondent treated the two $25,000 payments as ordinary rental income, and included the entire amount in gross income. Respondent, upon the theory that a sale was not consummated until December 1952, allowed a depreciation deduction for the year 1952. It was the intention of the parties to the contract of November 29, 1950, that the payments provided for therein should constitute equity payments to be applied to the purchase of the plantation rather than merely rent for the use of such property. Opinion The sole issue in this case is whether certain payments received by petitioner during the calendar years 1951 and 1952, which were allowed as a credit against the option (purchase) price of a plantation, are to be treated as proceeds from the sale of such plantation, as petitioners contend, or are rental income from such plantation prior to its sale, as the respondent has determined in his deficiency notice. In their respective briefs, both parties *100 cite and discuss many cases which have dealt with one phase or another of this problem. We do not think it would be helpful to review and discuss these various cases and undertake to decide on which side of the blurred line they fall. We think it is sufficient to say that, in our opinion, a study of these cases discloses that the principle extending through them is that where the "lessee" as a result of the "rental" payments acquires something of value in relation to the over-all transaction, other than the mere use of the property, he is building up an equity in the property and the payments do not therefore come within the definition of rent. Alexander W. Smith, Jr., Executor, 20 B.T.A. 27 (1930); Chicago Stoker Corporation, 14 T.C. 441 (1950); Judson Mills, 11 T.C. 25 (1948); Truman Bowen, 12 T.C. 446 (1949); D. M. Haggard, 24 T.C. 1124 (1955), affd. 241 F. 2d 288 (C.A. 9, 1956). On the other hand, if the parties actually intended to enter into a lease contract containing an option to purchase with normal rentals to be paid thereunder, then the lessee, up until he exercises his option to purchase, acquires *101 no equity in the property. What he has paid until the time he exercises his option to purchase is rent and should be taxed as such. Earl L. Lester, 32 T.C. 711 (1959). In order to properly discern the true character of the receipts in issue it is therefore necessary to ascertain the intention of the parties as evidenced by the legal effect of the contract itself, read in the light of the attending facts and circumstances existing at the time the agreement was executed. In the instant case the instrument in question purports by its terms to be a lease for a two-year period commencing January 1, 1951, and ending December 31, 1952. It calls for the payment by the "lessee" to the "lessor" of two annual payments of $25,000 each, or one-fourth of the yearly crops raised, whichever is greater. It is then provided that upon the payment of at least $50,000 at any time during the two-year period, the "lessee" has the option to purchase the property for $115,000, all amounts previously paid to be credited to the set purchase price. The option could be exercised upon the assumption of the existing mortgage and the execution of a second mortgage to the lessor for the balance. *102 We look first to the facts and circumstances surrounding the execution of the contract in determining the intent of the parties. At the trial petitioner testified that in 1950 he was primarily interested in selling his plantation; that he listed the plantation for the price of $120,000, and that Henry approached him concerning the purchase of the plantation. Concerning their discussions, petitioner testified that, after some bargaining, he had agreed to lower the purchase price to $115,000 which was then acceptable to Henry; that Henry told him he did not have any available cash to use as a down payment since he needed all of his available $20,000 for the purpose of converting the plantation to a rice farm; that Henry stated he would be able to pay $25,000 a year for two years, and it was agreeable to both that the title would be transferred at that time. The attorney who drafted the lease-option contract testified he could not recall whether he ever saw the Tomlinsons before he drafted the contract. Concerning the reason for using the lease-option contract, he testified: The form of the document, as I recall it, was my own brainchild. It was the only way I could at that time *103 accomplish what I knew their purposes to be as they explained them to me. There was a party that wanted to sell the property but did not want to divest himself of title until he had received $50,000 in cash, at which time he was willing to execute a deed. There was a purchaser on the other side who so far as I know didn't have the $50,000 at that time but thought he could have it over a two-year period, so I set it up as a lease for two years with an option to purchase at any time during the two-year period, as I recall it. * * * Both Henry and Walter testified at the trial. Neither, however, controverted petitioner's testimony concerning the original discussions or the explanation given by petitioner and his attorney as to why the leaseoption type of contract was used. The testimony of both was limited to their intent at the time of the execution of the contract. Henry, the only lessee according to the contract, (although both Tomlinsons signed the notes) testified on direct examination as follows: Q. Mr. Tomlinson, at the time of making the original lease with option contract dated November 29, 1950, what was your intent? A. Well, if the water was there and it was productive, *104 I would certainly have to carry out my agreement to purchase it. Q. Then if the land had water and the land proved productive, you would exercise your option? A. I would have to according to the contract. * * * On cross-examination, when asked what he meant by the above statements, he answered: "Well, we understood it if the farm didn't exercise the option, didn't produce enough to exercise the option, he [petitioner] could take the machinery that I owned there on the farm * * * for the purpose of rent." When cross-examined further, he testified that he didn't know this when he entered into the contract. Walter testified that they did not know at the time the contract was executed whether they would exercise the option at the end of the two-year period. He stated they first wanted to know whether the land contained sufficient water and was productive. Based upon the record as a whole, we are not convinced from the Tomlinsons' testimony that petitioner's version is incorrect. Respondent has offered no evidence controverting petitioner's clear testimony that the original intention of the parties as evidenced from their discussions was to enter into a sale of the plantation *105 and that the use of the lease agreement was merely a matter of draftsmanship by petitioner's attorney. In support of this is the uncontested assertion by petitioner that there was never any discussion between the parties concerning the leasing of the property or the rental price, as might be expected if the parties seriously contemplated that the option might not be exercised. While the circumstances surrounding the execution of the contract in question give every indication that a sale and purchase was intended, it is also significant to inquire as to whether, from an economic point of view, the arrangement was such as to give rise to an inference that a sale was intended. While there have been many economic tests adopted by the courts to help determine whether the parties intended a sale rather than a lease, no single test, or any special combination of tests, is decisive. No general rule applicable to all cases can be laid down and each case must be decided in the light of its own peculiar facts. While the main principle running through all of these tests is whether the "lessee" received an equity interest with each "rent" payment, the problem resolves itself into the question *106 whether there was a reasonable economic basis at the time the contract was executed to infer that a sale would be consummated at the expiration of the lease. One of the significant tests in determining this is the relationship between the anticipated value of the property as of the end of the lease to the amount which the lessee must pay at that time in order to exercise the option. D. M. Haggard, supra, p. 1129; Holeproof Hosiery Co., 11 B.T.A. 547, 556 (1928). The record does not contain any expert's valuation of the plantation as of November 1950. Nevertheless, we have a precise amount which a willing buyer was willing to pay, and which petitioner, a willing seller, was willing to accept. This amount of $115,000 then, can be taken to reflect the fair market value of the plantation at that time. D. M. Haggard, supra, p. 1130. The record fails to disclose any indication that the parties anticipated the value of the basically nondepreciable property would decrease during the two years thereafter. Indeed, the value would probably have been expected to increase due to the extensive permanent improvements contemplated by Henry. Henry, under *107 the contract, was required to pay at least $50,000 over the two-year period. Therefore, to receive title to the property, he had to pay, at most, an additional $65,000. This amount was to be represented entirely by mortgage assumptions without any further cash outlay, and with the maximum yearly principal payment of $6,000. This disparity in amounts in a short period of time is persuasive that a sale was contemplated from the very beginning and that there was little doubt, if any, that Henry would have exercised the option once the required $50,000 was paid. The "rentals" paid were clearly intended to be partial payments on the agreed purchase price of the plantation, and Henry was building up an equity in the property with each payment. We think it reasonable to conclude from an economic standpoint that both parties anticipated completion of the sale at the end of the two-year period in the absence of some unforeseen circumstance that would adversely affect the value of the land. Truman Bowen, supra; Ersel H. Beus, 28 T.C. 1133 (1957), affd. 261 F. 2d 176 (C.A. 9, 1958). Another significant economic factor in determining intent is the fact *108 that Henry, upon entering possession of the land, made extensive permanent improvements on the plantation costing approximately $20,000. He also removed a substantial amount of fencing encircling the property. These actions were not those of a man intending only to lease property for a two-year period. In addition, the contract provided that Henry was to pay all taxes and insurance. The lease also provided that if any of the improvements on the plantation should be destroyed or damaged, any insurance recovery by petitioner would be applied to reduce the total purchase price. The absence of any provision concerning the abatement of rent in such a contingency also indicates that the parties were mainly interested in the total price of the plantation rather than the yearly rental payments. Robert A. Taft, 27 B.T.A. 808, 812 (1933). Another indication that the parties considered the $50,000 a down payment rather than rent can also be seen from the fact that this amount would have to be paid regardless of when the option was exercised. The payments, then, did not even have the dual purpose of rent and purchase payment, for the same amount would have to be paid whether *109 the option was exercised at the end of the two-year period or on the day following the execution of the lease. In cases of this nature, another factor to be considered in determining whether the parties intended an equity to be built up by the "lessee" is the relationship between the annual rents and the fair rental value of the property. The inference arising from this circumstance in aid of determining intent is based upon the practical view that when a "lessee" with an option to purchase pays an otherwise excessive rental he does so because he is building up an equity in the property. Earl L. Lester, supra, p. 721; Truman Bowen, supra, p. 461; Chicago Stoker Corporation, supra, p. 445. A portion of the plantation containing the irrigation facilities was rented by petitioner in 1949 for $15 per acre. In the fall of 1950, petitioner offered to lease the entire plantation for $10 per acre. This amount was testified to by the offeree as a reasonable rental for the property. The annual rental provided for in the lease in issue was $25 per acre. The fact that this amount is far in excess of the reasonable value as evidenced from the above *110 transactions, coupled with the fact that there is no evidence of any discussion between the parties as to the renting of the land, supports petitioner's contention that the payments had no relationship to the rental value, but were intended to be partial payments on the sale of the property. It would be highly unlikely that if Henry only wanted to rent the property, he would pay such an excessive yearly rental (about 22 percent of the value of the property) in addition to the taxes and insurance premiums, especially considering the fact that the land was not immediately suited for his purposes, but required extensive and costly permanent improvements to so adapt the land. In his letter to the Tomlinsons of May 10, 1951, supra, petitioner had even acknowledged that the rental provided for in the lease was not a reasonable rental for the property. In that letter he offered to reduce the annual payments to $12,000 per year or $12 per acre if they would agree not to exercise the option to purchase. This amount more accurately reflected the rental value of the planation once the payments ceased to serve primarily as partial payments on its purchase. Unlike the cases relied upon by the *111 respondent where the amount provided in the lease-option agreement to be paid upon exercising the option approximated the anticipated depreciated value of the property as of the end of the lease, the property here was not greatly depreciable and the parties recognized from the beginning that the additional amount to be paid by Henry to exercise his option would be far less than the anticipated value of the property at the end of the two-year period. Unlike the situation presented in those cases, the element of doubt that the option would be exercised was greatly reduced in the instant case. Respondent contends that petitioner should not be allowed to treat the contract as a bona fide lease for all purposes except for the purpose of determining his tax liability. Assuming, although we do not so find, that petitioner treated the contract as respondent claims, the question would arise as to whether it would be inconsistent and unjust to permit him to exercise lessor's rights, but to cry "sale" when the tax collector knocked at his door. The crucial factor in deciding cases of this nature, as we have said before, is whether the intended effect of the transaction was to have the payments *112 serve as partial payments toward the ultimate sale of the property. The question arises then whether the rights which petitioner would possess as a lessor would be so inconsistent with the rights of a vendor as to nullify the effectiveness of the transaction as a method by which Henry could build up an equity in the plantation with his payments. There is no doubt that under Louisiana law, petitioner, as a lessor, would have had greater security for the payments than he would have had as a conditional vendor. As a lessor, he would have possessed a lien to secure the payments on all of the crops raised upon the plantation, second only to the workers on the plantation. La. Rev. Stat. (1950), Sec. 9.4521. As a conditional vendor, on the other hand, regardless of even a specific pledge on the crops which petitioner may have received from Henry, his lien would be inferior to all pledges held by those who loaned any money to Henry for crop production. La. Rev. Stat. (1950), Sec. 9.4341. See Saloy v. Block, 136 U.S. 338 (1890). While a literal reading of the contract, unrelated to the surrounding circumstances here presented, might support a view such as that contended for *113 by respondent, the actual intended effect of the contract, which was to sell, subject to compliance with the requirement to pay $50,000 on account of the purchase price, was in no way undermined. Petitioner was no less bound to convey the plantation upon the receipt of $50,000 under this contract than he would have been had the contract been worded as a conditional sale. Under the circumstances, and since the intent of the parties, as previously found by us appears clear, we adopt as a concise expression of our views a quotation from Alexander W. Smith, Jr., Executor, supra, p. 33, (which had adopted the same quotation from an adoption by Hays v. Jordan, 85 Ga. 741, 11 S.E. 833) reading as follows: It is evidently not the intention that this large sum should be paid as rent for the mere use of the engine for one year. If so, why agree to sell and convey the full title on the payment of the last installment? * * * No words employed by the parties can have the effect of changing the true nature of the contracts. Respondent also places great emphasis upon petitioner's notification to Tomlinson looking toward a termination (later withdrawn) of the contract *114 upon the nonpayment of the first note, and his refusal to take steps to subordinate any right he may have had to a lessor's lien in 1952. The first action was entirely consistent with petitioner's rights with respect to an option to purchase and was in no way indicative of a lease. As to the second, (a negative step) we seriously question whether, under the circumstances, petitioner could have enforced such a lien if contested. We need not, however, consider the technical legal aspects. On the question of intent, it is a factor to be considered, but, being subsequent to the execution of the contract, would have no more weight in determining the original intent of petitioner than the ultimate exercising of the option to purchase. We find it in no way here controlling over the more significant factors supporting petitioner's contention which we have already considered. We have approached the construction of the contract in issue under the rule recognized by the Supreme Court in Heryford v. Davis, 102 U.S. 235 (1880), where the Court said (p. 244): The answer to this question is not to be found in any name which the parties may have given to the instrument, and not alone *115 in any particular provisions it contains, disconnected from all others, but in the ruling intention of the parties, gathered from all the language they have used. It is the legal effect of the whole which is to be sought for. The form of the instrument is of little account. From our above discussion, we conclude that the intended legal effect of the contract in issue was to effectuate an ultimate sale of the plantation, the "lessee" having two years in which to pay the required down payment, during which time he had the use of the property. The so-called rental payments were in actuality partial payments on account of the agreed purchase price. We hold, therefore, that these receipts in the hands of petitioner constituted proceeds from the sale of property taxable as capital gains, and that respondent erred in determining that such payments were rentals and taxable as ordinary income. Decision will be entered under Rule 50.