WALTER D. and MILDRED SWIGART, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Swigart v. Commissioner
Docket No. 1864-79.
United States Tax Court
T.C. Memo 1980-379; 1980 Tax Ct. Memo LEXIS 205; 40 T.C.M. (CCH) 1215; T.C.M. (RIA) 80379; September 15, 1980, Filed Frank K. Leyshon, for the petitioners. Rose A. Mendes, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined *206 deficiencies in petitioners' Federal income taxes for the years 1970 through 1975 as follows: Year
Deficiency
1970
$ 129.85
1971
259.69
1972
168.71
1973
1,218.11
1974
1,156.56
1975
1,480.00
After concessions by petitioners, the issues for decision are: (1) whether agreements between petitioner Walter D. Swigart (Swigart) and his sons with respect to two mobile homes were leases or contracts of sale; (2) whether certain amounts are deductible by petitioners as losses incurred in pursuit of a trade or business; and (3) whether petitioners are entitled to claimed investment tax credits. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and the accompanying exhibits are incorporated herein by this reference. Petitioners resided in Lore City, Ohio, at the time they filed their petition herein. They filed their joint Federal income tax returns for the years 1970 through 1975 and amended returns for the years 1970 through 1974 with the Internal Revenue Service at Cincinnati, Ohio. From 1966 through 1975, Swigart was employed full-time as a civil engineer by the Ohio Power Company, Canton, *207 Ohio. On June 9, 1962, petitioners purchased 79.13 acres of undeveloped land located in Madison Township, Guernsey County, Ohio, for $20 an acre. On one acre of the land, petitioners constructed a house for use as their personal residence. They moved into the house in 1970. Petitioners purchased the land with the idea that it could be developed for recreational purposes because a state park was to be built in its vicinity. Salt Fork State Park opened in 1968 and is located 1,320 feet from the nearest boundary of petitioners' property. Petitioners' development plan for the land contemplated the following improvements: (1) primitive camping sites; (2) a cabin area; (3) a camper site; (4) three ponds; (5) a ski area; (6) an ice skating area; (7) an outdoor pavilion; and (3) a chapel. Petitioners originally hoped to complete the construction of access roads by 1975 or 1976 and to open the camper site in 1974, the primitive camping sites in 1975, and the cabin area in 1976 and to have all the projects completed and open for use in 1978. No steps were taken toward carrying out the plan until 1971 when Swigart did a topographical survey to determine the proper location for *208 the various improvements. Petitioners began to cut access roads into the property in 1971 or 1972. For this purpose, a construction-type bulldozer, backhoe and rotor, and a tractor and all the necessary accessories were purchased. Work on the roads continued through 1973, 1974, and 1975 and is still unfinished. Approximately three miles of road have been completed. In 1973, two mobile homes were purchased, both of which were registered in the name Christian Creek Enterprises, a name used with respect to the activities in regard to development of the campground. The first, a "Nashua model," purchased on May 27, 1973, cost $6,187; the second, a "Beverly model," purchased on June 27, 1973, cost $4,550. Both were paid for by check drawn on the account of Christian Creek Enterprises. The mobile homes were located on a section of the land designated as a caretaker area. The mobile homes were used as a storage area for tools and as a work area for planning and surveying. In addition, petitioners' two sons, who lived with them and participated in the development of the property, sometimes remained overnight in the mobile homes when they worked late at the camp site. A road was *209 opened into the section where the mobile homes were located. On July 15, 1973, Swigart and his son Randal entered into an agreement with regard to the Nashua model home, designated as an "agreement to rent mobile home," and providing for "a total rental price of $11,500.00." The agreement further provided in part: * * * Receipt of $500.00 payment is hereby acknowledged leaving a $11,000.00 balance to be satisfied by a principal payment (remaining balance) after a 7 1/2% interest charge has been deducted each month. The balance of $11,000.00 to be paid in monthly payments over a four (4) period payment schedule. The First period-3 years, the second period-2 years, the third period-2 years, and the fourth period-2 years at the rate of $100.00 a month, $140.00 a month, $180.00 a month and $220.00 a month respectfully. Monthly payments shall begin on July 15, 1973 and on the 15th of each month thereafter through the 4th period payment schedule and/or any extra number of months as required to reduce the principal to $0.00 dollars. The terms of these four (4) payment periods being fully satisfied then the certificate of title to this mobile home and the land that it is positioned *210 on * * * the improvement thereon all inclusive will be signed over to the payor. Payor may not accelerate payments under this contract. Title to remain in seller's name and seller may control and manage this property. In event of default, the payor has no interest either in the property or the trailor. Swigart and his son Walter entered into an agreement with regard to the Beverly mobile home providing the same terms, except that the "total rental price" was $10,500 and, consequently, the amounts of the monthly payments were slightly different. Swigart's purpose in entering these agreements was to give his sons a place to live and work in a manner which would eventually provide them with ownership of a part of the business. The mobile homes remained registered in the name of Christian Creek Enterprises. The sums of the payments received under the two agreements during 1973, 1974, and 1975 were as follows: Total Payments
Interest
Principal
1973
$2,100.00
$ 616.21
$1,483.79
1974
2,400.00
1,508.50
891.50
1975
2,400.00
1,439.24
960.76
During 1973, Swigart also performed surveying work for the ponds and prepared a site for a chapel. *211 He thought a chapel would be a tourist attraction of historical interest becase outdoor religious meetings had once been held in the vicinity of the property. In 1969, Rodney Dennis, the person from whom petitioners had purchased the property, filed suit against them claiming that 20 acres of land along the south border of their property was not part of their purchase. Title to this land was important to petitioners' development of their property because approval of their plan for sewage and water treatment by the Ohio Environmental Protection Agency depended on access to a creek flowing through the 20 acres. The litigation was concluded in 1979 when the Supreme Court of Ohio denied petitioners' application for leave to appeal an adverse decision of the Court of Appeals. Petitioners are attempting to develop an alternate plan for sewage and water treatment which would obtain Environmental Protection Agency approval. No part of the campground was completed and opened to the public in the years 1973, 1974, and 1975. In their returns for the years 1973, 1974, and 1975, petitioners reported part of the payments received from their sons, in the amounts of $790.28, $1,415.30, *212 and $1,475.10, respectively, as interest income, with the description "substitute for gross receipts, schedule C." Petitioners reported no gross receipts on their schedules C (Profit or (Loss) from Business or Profession) for the years 1973, 1974, and 1975. [1] They claimed losses on their schedules C for the years 1973, 1974, and 1975 as a result of various expenses (as to which there is no issue as to substantiation) in the amounts of $1,770.15, $3,185.51, and $7,010.16, respectively. Respondent, in his notice of deficiency, disallowed the losses claimed on the schedules C on the ground that petitioners were not engaged in a trade or business. Respondent determined that Swigart sold the mobile homes to his sons and realized interest income and long-term capital gain, taxable under the installment method, as follows: [2]
*213 Interest Income
Capital Gain
1973
$266.21
$347.30
1974
908.50
210.49
1975
839.24
226.85
On their returns, petitioners claimed investment credits in 1973 with respect to the two mobile homes, a bulldozer, and other equipment and an investment credit with respect to unidentified property in 1975. They also claimed investment credit carrybacks to the years 1970, 1971, 1972, and 1974. Respondent determined that petitioners were not entitled to the investment credits climed, nor consequently to the investment credit carrybacks, on the ground that petitioners were not engaged in a trade or business during 1973 or 1975. The deficiencies with respect to the years 1970, 1971, and 1972 are attributable solely to the disallowance of the investment credit carrybacks. OPINION At the outset, we observe that the two issues presented herein involve essentially questions of fact, namely, (1) the characterization of the agreement with the sons covering the two mobile homes as leases or sales and (2) whether petitioners were engaged in a trade or business during the taxable years 1973, 1974, and 1975. The burden of proof as to both issues is on the petitioners. *214 Welch v. Helvering,290 U.S. 111 (1933), Rule 142(a), Tax Court Rules of Practice and Procedure. We hold that they have failed to carry that burden on both issues. With respect to the first issue, involving the mobile homes, respondent contends that, although the agreements were designated agreements to rent the mobile homes, they effected a sale of the mobile homes to the sons on an installment basis. It is well settled that whether an agreement is regarded as a sale or a lease for Federal tax purposes is determined by the substance of the transaction and not the terminology employed. The intent of the parties when the agreement was executed, as ascertained from the practical effect of the agreement and all the attendant facts and circumstances, is controlling. Lockhart Leasing Co. v. Commissioner, 54 T.C. 301, 313-314 (1970), affd. 446 F.2d 269 (10th Cir. 1971); Martin v. Commissioner, 44 T.C. 731, 740-741 (1965), affd. per curiam on this issue 379 F.2d 282 (6th Cir. 1967); Haggard v. Commissioner, 24 T.C. 1124, 1128 (1955), affd. per curiam 241 F.2d 288 (9th Cir. 1956); *215 Bowen v. Commissioner, 12 T.C. 446, 459 (1949); see also Thompson v. Commissioner, 73 T.C. 878, 890 (1980). Where the purported lessee acquires title to, or equity in, the property by virtue of his payments, the agreement will be treated as a contract of sale. Haggard v. Commissioner, 24 T.C. at 1128. For the following reasons, we agree with respondent that the agreements in question were intended to, and did, effect a sale. First, this conclusion is supported by Swigart's testimony that one of his motives for entering into these agreements was to provide that his sons would ultimately own part of the business. Second, it is clear that the sons were to acquire equity in the mobile homes and land through their purported rental payments, since, at the end of the payments periods, they would acquire title to the property without any requirement of additional payment. Third, the terminology of the agreements, which state a total price and allocate part of each payment to principal and part to interest, is that generally associated with an installment sale, rather than a lease. [3]
*216 Petitioners have not disputed respondent's allocation of the payments under the agreements between capital gains and interest income. We, therefore, sustain respondent's determination. The next issue is whether petitioners may deduct expenses incurred in connection with the development of their 79 acres in 1973, 1974, and 1975 as expenses incurred in carrying on a trade or business under section 162. [4]
The record shows that petitioners' proposed campground facilities were only in the preliminary stages of development during the years in question. No facilities were being offered for public use or were ready to be so offered. In fact, there is no evidence that such facilities were ever completed or opened. Expenses incurred in preparation for engaging in a business at a future time are not deductible under section 162. Richmond Television Corp. v. United States,345 F.2d 901, 905-907 (4th Cir. 1965), revd. and remanded on another issue, 382 U.S. 68 (1965); Madison Gas & Electric Co. v. Commissioner,72 T.C. 521, 566-567 (1979); *217 Downs v. Commissioner,49 T.C. 533, 540 (1968). [5]
Petitioners argue that they intended to engage in a business but were prevented from doing so by litigation in regard to title to part of their land which was essential to their plan for waste disposal. We need not consider here whether we would reach a different conclusion had petitioners been prevented from commencing their business by an intervening event, such as litigation, because the record does not support the argument that the litigation prevented petitioners from opening their business. First, they did not begin development until 1971, two years after the litigation was begun. Second, even according to their original plan, no part of the campground was to open in 1973, one of the years in which they seek to deduct expenses. Third, their development of the campground was so rudimentary at the end of 1975 that we are convinced that there was no possibility that they could have adhered to their original schedule of opening parts of the site in 1974 and 1975. We do not believe that but for the litigation they would have been *218 engaged in the business of operating recreational facilities during the taxable years at issue. Although petitioners reported the payments received from their sons for the mobile homes as gross receipts from a trade or business, the record does not support an argument that they were in the business of selling mobile homes. These were merely isolated casual sales. See generally, Mitchell v. Commissioner,47 T.C. 120, 126 (1966), and cases cited thereat. Swigart testified that he never intended to offer mobile homes to the public for sale or rental. Nor does the record contain sufficient evidence that the mobile homes were being held for the production of income, independently of the claimed trade or business in respect of camping and recreational facilities, so as to sustain a deduction under section 212. Indeed, if anything, the evidence points in the opposite direction, namely, that the mobile homes were intended to be an integral part of the aforesaid claimed trade or business or for the personal use of the sons. Finally, and perhaps most importantly, the record herein is totally insufficient to show the relationship, if any, between the maintenance or use *219 of the mobile homes and the expenditures (beyond those otherwise allowed by respondent) giving rise to the claimed losses. Finally, we turn to the issue of the investment credits claimed by petitioners in 1973 in respect of the mobile homes, a bulldozer, and other equipment used in connection with the development of the campsite and, in 1975, in respect of unidentified property. Petitioners, at trial, agreed that the allowance of the investment credit turned on the issue of whether they were engaged in a trade or business during the taxable years 1973, 1974, and 1975. Thus, it follows from our conclusion that they were not so engaged that respondent's determination that such credit should be disallowed should be sustained. We note in passing, however, that, even if we had held otherwise, petitioners would have faced further obstacles. First, the transfer of the mobile homes in the year of acquisition from Swigart to his sons (which we have held to be sales) would require the disallowance of any credit with respect thereto for 1973. See section 1.46-3(a)(2), Income Tax Regs. The same result would follow even if we had held (see p. 15, supra) that petitioners were in the *220 trade or business of selling mobile homes or that they held such homes for the production of income -- conditions which would have met threshhold requirements set forth in section 48(a)(1). Second, the personal use of the mobile homes for living by the sons and the absence of any clear evidence as to their use for business purposes would seem to inhibit any allowance of the investment credit. See Everhart v. Commissioner,61 T.C. 328, 331 (1973). Third, with respect to the credit claimed for 1975, no evidence was introduced as to the property for which that credit was claimed. Decision will be entered for the respondent.
Footnotes
1. There is no evidence that petitioners in fact received any income during 1973, 1974, and 1975 from permitting the use of any of their land for camping or other recreational purposes.↩
2. The record does not make clear how respondent determined that the capital gains were long-term rather than short-term and has raised no issue in this respect. See also footnote 3, infra↩.
3. We do not regard the retention of title by Swigart or the proprietorship, Christian Creek Enterprises, until all payments were made to be anything more than the retention by the seller of a security interest.↩
4. All section references, unless otherwise indicated, are to the Internal Revenue Code of 1954, as amewnded and in effect in the taxable years at issue.↩
5. See also Graybeal v. Commissioner,T.C. Memo. 1979-506↩.